

**U.S. Department of Justice**

Antitrust Division

---

*RFK Main Justice Building*

*950 Pennsylvania Avenue, N.W.*
*Washington, D.C. 20530-0001*

March 11, 2025

**BY ELECTRONIC FILING**

Hon. Clifton Cislak, Clerk of Court
United States Court of Appeals for the D.C. Circuit
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

> **Re:** ***United States et al. v. Google LLC***, No. 25-5016
> **Oral Argument Not Yet Scheduled**

Under the established schedule governing remedies-phase litigation below (*see* A618), Plaintiffs-Appellees and Google submitted Revised Proposed Final Judgments on Friday, March 7, 2025, with the benefit of more than three months of additional remedies-focused discovery since the initial Proposed Final Judgments were filed. Plaintiffs-Appellees file this letter under Fed. R. App. P. 28(j) to draw the Court's attention to these filings, given their relevance to this appeal.

The Revised Proposed Final Judgments do not materially change the analyses of timeliness and adequacy of representation laid out in Plaintiffs-Appellees' brief. *See* Plaintiffs-Appellees' Resp. Br. 29-55 (timeliness); 58-65 (adequacy).

To the extent the Revised Proposed Final Judgments affect the issues in this appeal, they further underscore why Apple has no right to intervene. First, Plaintiffs-Appellees' revised proposal undercuts Apple's already-deficient claim of inadequacy of representation. Apple argues that Plaintiffs-Appellees' initial Proposed Final Judgment "would prohibit Apple from receiving revenue from Google no matter the terms." Apple Reply Br. 7. But under Plaintiffs-Appellees' Revised Proposed Final Judgment, Google is prohibited only from making search-related payments to Apple, i.e., payments for "(1) preferential treatment of a General Search Engine"; "(2) making or maintaining any [search engine] as a default"; or



**U.S. Department of Justice**

Antitrust Division

---

"(3) preinstallation, placement, or default status of any Search Access Point," including "payments for Choice Screens." Dkt. 1184-1 (Attachment A) at 8; *see* Dkt. 1184-3 (Attachment B) at 8 (redline). The Revised Proposed Final Judgment further provides that "Google may make payments that are unrelated to search." Attachment A at 9.

Second, Google's Revised Proposed Final Judgment is unchanged and thus retains the provision in Google's initial proposal authorizing Google to pay Apple (and others) for distribution. Dkt. 1185 (Attachment C) at 5. This continues to belie Apple's claim that Google became an inadequate representative only just prior to Apple's untimely request for intervention. *See* Plaintiffs-Appellees' Resp. Br. 60-61.

Respectfully submitted.

/s/ Matthew A. Waring

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., N.W.
Room 3313
Washington, D.C. 20530-0001
(202) 532-4186
matthew.waring@usdoj.gov

*Counsel for the United States*

cc:    All Counsel of Record (by CM/ECF)

# Attachment A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | |
| | Case No. 1:20-cv-03010-APM |
| v. | |
| | HON. AMIT P. MEHTA |
| GOOGLE LLC, | |
| Defendant. | |
| STATE OF COLORADO, *et al.*, | |
| Plaintiffs, | |
| | Case No. 1:20-cv-03715-APM |
| v. | |
| | HON. AMIT P. MEHTA |
| GOOGLE LLC, | |
| Defendant. | |

## PLAINTIFFS' REVISED PROPOSED FINAL JUDGMENT

WHEREAS, Plaintiffs United States of America, and the States and Commonwealths of Arkansas, California, Georgia, Florida, Indiana, Kentucky, Louisiana, Michigan, Missouri, Mississippi, Montana, South Carolina, Texas, and Wisconsin, by and through their respective Attorneys General ("Co-Plaintiff States"), filed their Complaint on October 20, 2020, and their Amended Complaint on January 15, 2021;

AND WHEREAS, Plaintiffs Colorado, Nebraska, Arizona, Iowa, New York, North Carolina, Tennessee, Utah, Alaska, Connecticut, Delaware, District of Columbia, Guam, Hawaii, Idaho, Illinois, Kansas, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico,

Rhode Island, South Dakota, Vermont, Virginia, Washington, West Virginia, and Wyoming (together "Colorado Plaintiff States") filed their Complaint on December 17, 2020;

AND WHEREAS, the Court conducted a trial and entered Findings of Fact and Conclusions of Law in both actions on August 5, 2024;

AND WHEREAS, the Court entered judgment finding Google liable for violating Section 2 of the Sherman Act by unlawfully maintaining its monopolies in the general search services and general search text advertising markets;

NOW THEREFORE, upon the record at trial and all prior and subsequent proceedings, it is hereby ORDERED, ADJUDGED, AND DECREED:

## I.    JURISDICTION

The Court has jurisdiction over the subject matter of this action and over Google.

## II.    APPLICABILITY

This Final Judgment applies to Google, as defined below, and to all other persons in active concert or participation with Google who have received actual notice of this Final Judgment by personal service or otherwise.

## III.    DEFINITIONS

As used in this Final Judgment:

A.    "Ads Data" means data related to Google's selection, ranking, and placement of Search Text Ads in response to queries, including any User-side Data used in that process.

B.    "Android" means all code, software, applications, application programming interfaces (APIs), and other products and services provided by Google through the Android Open Source Project (AOSP), including the open-source application framework, libraries, runtime, and kernel, which are published at http://source.android.com (or successor sites), and any software

development kits made available at http://developer.android.com (or successor sites) and all

code, software, applications, APIs, and other products and services provided by Google that are

critical, as informed by the views of the Technical Committee, to the full and proper functioning

of an Android Device. For the purposes of this Final Judgment, Android also includes (1) the

Google Play Store and Google Play Services; (2) all other code, software, applications, APIs, and

products and services provided by Google that are critical, as informed by the views of the

Technical Committee, to the full and proper functioning of the Google Play Store and Google

Play Services; and (3) all code, software, applications, APIs, and other products and services that

Google adds to open-source Android to implement the operating system (OS) on Pixel Devices.

   C.  "API" or "application programming interface" means a mechanism that allows

different software components to communicate with each other.

   D.  "Apple" means Apple Inc., a corporation organized and existing under the laws of

the State of California, headquartered in Cupertino, California, its successors and assigns, and its

subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors,

officers, managers, agents, and employees.

   E.  "Choice Screen" means a Search Access Point Choice Screen or Search Default

Choice Screen as defined in Section IX.

   F.  "Chrome" means all code, software, applications, APIs, and other products and

services included in Google's Chromium or the Chrome browser, including the open-source

application framework, libraries, runtime, and kernel which are published at

http://www.chromium.org (or successor sites), and all code, software, applications, APIs, and

other products and services provided by Google that are critical, as informed by the views of the

Technical Committee, to the full and proper functioning of Chromium or the Chrome browser.

G.    "Competitor" means any provider of, or potential entrant in the provision of, a General Search Engine (GSE) or of Search Text Ads in the United States.

H.    "Device" means any smartphone, tablet, laptop, desktop, or other device that allows a user to access general search functionality.

I.    "Distributor" is any Person that contracts with Google to display, load, or otherwise provide access to a Google product.

J.    "GenAI" or "Generative AI" is a type of artificial intelligence that creates new content including but not limited to text, images, code, classifications, and other media using machine learning models.

K.    "GenAI Product" means any application, software, service, feature, tool, functionality, or product that involves or makes use of Generative AI capabilities or models. It can include GenAI Search Access Points.

L.    "Google" means Defendant Google LLC, a limited liability company organized and existing under the laws of the State of Delaware, headquartered in Mountain View, California, its parent Alphabet Inc., their successors and assigns, subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

M.    "Google Browser" means any web browser owned by Google, including Chrome until divested.

N.    "Google Device" means any Device manufactured or refurbished by Google, including Pixel phones and tablets.

O.    "Google Grounding API" means any method, including via API, by which foundation model output or a GenAI Product can connect, call, access, retrieve, or display links or information from Google's GSE.

P.    "General Search Engine" or "GSE" means software or a service that produces links to websites and other relevant information in response to a user query or prompt. "General Search Engine" or "GSE" also has the meaning defined and used in the Court's Memorandum Opinion of August 5, 2024, ECF 1032, at 8.

Q.    The terms "include" and "including" should be read as "including but not limited to," and any use of either word is not limited in any way to any examples provided.

R.    "On-device AI" is a type of artificial intelligence (AI) model that runs on a Device instead of on a cloud server. On-device AI includes a large language model (LLM) or universal language model (ULM) stored entirely on a Device.

S.    "Person" or "person" means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust.

T.    "Publisher" means any Person who controls the legal right to any information published or otherwise made available on any website or through any mobile app.

U.    "Qualified Competitor" means a Competitor who meets the Plaintiffs' approved data security standards as recommended by the Technical Committee and agrees to regular data security and privacy audits by the Technical Committee, who makes a sufficient showing to the Plaintiffs, in consultation with the Technical Committee, of a plan to invest and compete in the GSE and/or Search Text Ads markets, and who does not pose a risk to the national security of the United States.

V.     "Search Access Point" means any software, application, interface, digital product, or service where a user can enter a query or prompt and, in response to at least some user queries or prompts, receive (or be directed to a place to receive) a response that includes information from a GSE, including links to websites. Search Access Points include OS-level Search Access Points, browsers (including Search Access Points within browsers such as browser address bars), search apps, and GenAI Products that can retrieve and display information from a GSE, including links to websites.

W.     "Search Feature" in Google Search means any content on a SERP that is not an organic link. Search Features include images, featured snippets, hotel units, query expansion features like auto-complete, "did you mean" prompts, spelling corrections, and related searches.

X.     "Search Index" means any databases that store and organize information about websites and their content that is crawled from the web, gathered from data feeds, or collected via partnerships, from which Google selects information to provide results to users in response to general search queries.

Y.     "Search Text Ad" means a general search text advertisement, which is an ad that resembles an organic link on a SERP. "Search Text Ad" also has the meaning defined and used in the Court's Memorandum Opinion of August 5, 2024, ECF 1032, at 60, and includes Search Text Ads appearing in or in connection with Google AI Overviews.

Z.     "SERP" or "Search Engine Results Page" means the results provided by a search engine, in response to a user query, including links and other features and content, including from a broad index of the web. "SERP" or "Search Engine Results Page" also has the meaning defined and used in the Court's Memorandum Opinion of August 5, 2024, ECF 1032, at 19.

AA.    "Technical Committee" or "TC" means the five-person committee of experts appointed by the Court pursuant to Paragraph X.A.

BB.    "User-side Data" means all data that can be obtained from users in the United States, directly through a search engine's interaction with the user's Device, including software running on that Device, by automated means. User-side Data includes information Google collects when answering commercial, tail, and local queries. User-side Data may also include datasets used to train (at all stages of training including pre-training and filtering, post-training, fine-tuning) Google's ranking and retrieval components, as well as GenAI models used for Google's GenAI Products.

## IV.    PROHIBITION ON FORECLOSING OR OTHERWISE EXCLUDING COMPETITORS THROUGH CONTRACTS WITH THIRD PARTIES THAT MAINTAIN GOOGLE'S MONOPOLIES

The purposes of the remedies set forth in this Section are to unfetter the monopolized markets from Google's exclusionary practices, pry open the monopolized markets to competition, remove barriers to entry, and ensure there remain no practices likely to result in unlawful monopolization of these markets and related markets in the future by prohibiting contracts that foreclose or otherwise exclude Competitors, including by raising their costs, discouraging their distribution, or depriving them of competitive access to inputs.

A.    <u>Preferential Treatment And Payments To Non-Apple Third Parties Prohibited</u>: Google must not offer or provide anything of value to any non-Apple third party, including payments, for (1) preferential treatment of a General Search Engine (GSE) or Search Access Point relative to Competitors; (2) making or maintaining any GSE as a default within a new or existing Search Access Point or for undermining, frustrating, interfering with, or in any way discouraging the use of any GSE Competitor; or (3) preinstallation, placement, or default status

of any Search Access Point. This prohibition includes payments for Choice Screens (with the limited exception noted in Section IX) and preferential treatment of GSE distribution or inputs that would have the effect of disadvantaging any GSE Competitor.

B.    Preferential Treatment And Payments To Apple Prohibited: Google must not offer or provide anything of value to Apple, including payments, for (1) preferential treatment of a General Search Engine (GSE) or Search Access Point relative to Competitors; (2) making or maintaining any GSE as a default within a new or existing Search Access Point or for undermining, frustrating, interfering with, or in any way discouraging the use of any GSE Competitor; or (3) preinstallation, placement, or default status of any Search Access Point. This prohibition includes payments for Choice Screens and preferential treatment of GSE distribution or inputs that would have the effect of disadvantaging any GSE Competitor.

C.    Exclusionary Agreements With Publishers Prohibited: Google must not enter into a contract or other agreement, or enforce any existing agreement, with any Publisher to license data from any Publisher, website, or content creator, which provides Google exclusivity or otherwise restricts the Publisher's ability to license or otherwise make available the data to any other GSE or GenAI Product developer. This includes, for example, any agreement with a "most favored nation" or any similar provision that would require the Publisher to give Google the best terms it makes available to any other buyer or licensee.

D.    Conditional Access Prohibited: Google must not condition access or terms of access to the Play Store or any other Google product on a distribution agreement for a GSE, Search Access Point, or Choice Screen; or an agreement not to distribute a Competitor's product or service. Google must not bundle, tie, comingle, or otherwise condition, a GSE or Search

Access Point with any other Google product, for example, by licensing a Google product to a Distributor and including a GSE or Search Access Point license for free.

E.    <u>Revenue Share Payments Prohibited</u>: Google must not offer or provide to any Distributor any payment that is determined or calculated based on the usage of or revenue generated by—or any similar factor for—any particular GSE or Search Access Point (e.g., Google queries, Google Search Text Ad clicks, Google selections on a Choice Screen). For clarity, Google may make payments that are unrelated to search and are not determined or calculated based on the usage of or revenue generated by—or any similar factor for—any particular GSE or Search Access Point.

F.    <u>Search Ad Syndication Payments</u>: Notwithstanding any other provision, Google may make payments to entities syndicating Search Ads from Google, subject to the provisions of Paragraph VIII.E.

G.    <u>Permitted Payments</u>: Notwithstanding any other provision, Google may make the following payments:

      1.    Google may pay a third-party to show ads for Search Access Points in an app store, and for offering a Search Access Point in an app store, provided that:

          a)    the app store includes at least three similar non-Google Search Access Points;

          b)    the Google Search Access Point does not receive more favorable treatment than any other similar Search Access Point; and

          c)    the payment complies with Paragraph IV.E.

2.    Google may offer or provide payment or other valuable consideration to a consumer for utilizing Google Search, e.g., Google may pay a consumer for each search they conduct using Google Search. Google must not offer or provide anything of value, including payments, to a consumer to set Google Search as the default GSE.

H.    <u>Acquisitions And Investments</u>: Google must not, without providing Prior Notification, as defined in Paragraph IV.I, to the United States and the Plaintiff States, acquire any interest in, or part of, any company; enter into a new joint venture, partnership, or collaboration; or expand the scope of an existing joint venture, partnership, or collaboration, with any company that competes with Google in the GSE or Search Text Ads markets or any company that controls a Search Access Point or GenAI Product. Nothing in this Paragraph IV.H prevents any Plaintiff from separately investigating or challenging the legality of an acquisition, joint venture, partnership, or collaboration under applicable state or federal law.

I.    <u>Prior Notification</u>:

1.    Unless a transaction is otherwise subject to the reporting and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15 U.S.C. § 18a (the "HSR Act"), Google may not, without first providing notification to the United States and the Plaintiff States, directly or indirectly acquire (including through an asset swap agreement) any assets of or any interest, including a financial, security, loan, equity, or management interest, in any person or entity that competes with Google in the GSE or Search Text Ads markets or any company that controls a Search Access Point or Gen AI Product.

2.      Google must provide the notification required by this Paragraph IV.I in the

same format as, and in accordance with the instructions relating to, the

Notification and Report Form set forth in the Appendix to Part 803 of

Title 16 of the Code of Federal Regulations, as amended. Such notice must

also be made to the Plaintiff States. Notification must be provided at least

thirty (30) calendar days before acquiring any assets or interest, and must

include, beyond the information required by the instructions, the names of

the principal representatives who negotiated the transaction on behalf of

each party and all management or strategic plans discussing the proposed

transaction. If, within the thirty (30) calendar days following notification,

representatives of the United States (after consultation with the Co-

Plaintiff States and the Colorado Plaintiff States' enforcement committee),

make a written request for additional information, Google may not

consummate the proposed transaction until thirty (30) calendar days after

submitting all requested information.

3.      Early termination of the waiting periods set forth in this Paragraph IV.I

may be requested and, where appropriate, granted in the same manner as is

applicable under the requirements and provisions of the HSR Act and

rules promulgated thereunder. This Paragraph IV.I must be broadly

construed and any ambiguity or uncertainty regarding whether to file a

notice under this Paragraph IV.I must be resolved in favor of filing notice.

J.      <u>No Circumvention Of This Section's Purposes</u>: Google may not undertake any

action or omission with the purpose or effect of circumventing or frustrating the purposes of this

Section or any of its provisions. For example, Google may not make payments permitted under Paragraphs IV.A, B, E, or G with the purpose or effect of circumventing or frustrating the purposes of this Section. Complaints regarding non-compliance with this Section may be referred to the TC for review in accordance with Paragraph X.C.3 below.

## V.    PROHIBITION ON FORECLOSING OR OTHERWISE EXCLUDING GSE AND SEARCH TEXT AD COMPETITORS THROUGH OWNERSHIP OR CONTROL OF RELATED PRODUCTS

The purposes of the remedies set forth in this Section are to unfetter the monopolized markets from Google's exclusionary practices, pry open the monopolized markets to competition, remove barriers to entry, and ensure there remain no practices likely to result in unlawful monopolization of these markets and related markets in the future by requiring Google to divest its browser Chrome and prohibiting Google from providing its search products preferential access to related products or services that it owns or controls such as its mobile operating system (e.g., Android).

A.    <u>Chrome Divestiture</u>: Google must promptly and fully divest Chrome, along with any assets or services necessary to successfully complete the divestiture, to a buyer approved by the Plaintiffs in their sole discretion, subject to terms that the Court and Plaintiffs approve. The evaluation of any potential buyer shall include the potential buyer's proposed business and investment plans (including those for open-source project Chromium), the United States' evaluation, at its sole discretion, of any potential risks to national security, the potential buyer's plans for sharing and protecting user data included in the acquisition, and any other issues a potential buyer may present. Google may not release any other Google Browser during the term of this Final Judgment absent approval by the Court, but Google may continue to support the existing functionality of non-Chrome Google Browsers that have already been released as of

March 7, 2025. Nothing in this Paragraph V.A prevents any Plaintiff from separately investigating or challenging the legality of an acquisition, joint venture, partnership, or collaboration under applicable state or federal law.

B.    <u>Self-Preferencing Prohibited</u>: Google must not use its ownership and control of Android, or any other Google product or service, to:

1.    make any GSE, Search Access Point, GenAI Product, or On-Device AI explicitly or implicitly mandatory on Android Devices, for example, by preventing interoperability between Android AICore or a Google Grounding API and Competitor products and services in the GSE or Search Text Ads markets;

2.    reduce, prevent, or otherwise interfere with the distribution of a Competitors' GSE, Search Access Point, or GenAI Products;

3.    degrade any aspect of quality, including the features, functionality, or user experience, on a Competitor's GSE, Search Access Point, or GenAI Products;

4.    explicitly or implicitly, directly or indirectly, prevent or discourage manufacturers or other Android partners (e.g., carriers) from working with Competitors' GSE, Search Access Point, or GenAI Products;

5.    explicitly or implicitly, directly or indirectly, punish or penalize manufacturers or other Android partners (e.g., carriers) that work with Competitors' GSE, Search Access Point, or GenAI Products; or

6.    otherwise use its ownership and control of Android to explicitly or implicitly, directly or indirectly, force or coerce manufacturers or other

Android partners (e.g., carriers) to (i) work with Google's GSE or GenAI

Products or (ii) give Google's products and services any better treatment

than given Competitors' products.

C.     Contingent Structural Relief: In the event the remedies in this Final Judgment

prove insufficient to serve their intended purposes of restoring competition or if Google attempts

to or is successful in circumventing these remedies, then the Court may impose additional

structural relief, including the divestiture of Android. If, at least five (5) years after entry of this

Final Judgment, if Plaintiffs demonstrate by a preponderance of the evidence that either or both

monopolized markets have not experienced a substantial increase in competition, then Google

shall divest Android unless Google can show by a preponderance of the evidence that its

ownership or control of Android did not significantly contribute to the lack of a substantial

increase in competition.

D.     No Circumvention Of This Section's Purposes: Google may not undertake any

action or omission with the purpose or effect of circumventing or frustrating the purposes of this

Section or any of its provisions. Complaints regarding non-compliance with this Section may be

referred to the TC for review in accordance with Paragraph X.C.3 below.

## VI.     REQUIRED DISCLOSURES OF SCALE-DEPENDENT DATA NECESSARY TO COMPETE WITH GOOGLE

The purposes of the remedies set forth in this Section are to remove barriers to entry, pry

open the monopolized markets to competition, and deprive Google of the fruits of its violations

by providing Competitors access to scale-dependent data inputs—for both search and ads—that

would otherwise provide Google an ongoing advantage from its exclusionary conduct. These

remedies are intended to make this data available in a way that provides suitable security and

privacy safeguards for the data that Google must share.

A.    <u>Google's Search Index</u>: For the term of this Final Judgment, Google will make available, at marginal cost, to Qualified Competitors the following data related to Google's Search Index, in addition to any data made available by Google via the APIs required under Sections VII and VIII:

1.    for each document in the Google Search Index a unique identifier (DocID) and another notation sufficient to denote all the documents Google considers duplicates of each other;

2.    a DocID to URL map;

3.    for each DocID a set of signals, attributes, or metadata associated with each DocID that are derived in any part from User-side Data including but not limited to (A) popularity as measured by user intent and feedback systems including Navboost/Glue, (B) quality measures including authoritativeness, (C) time that the URL was first seen, (D) time that the URL was last crawled, (E) spam score, (F) device-type flag, and (G) any other specified signal the TC recommends to be treated as significant to the ranking of search results; and

4.    databases consisting of information sufficient to recreate Google's Knowledge Graph, including local information.

This information must be provided for all websites in the full Search Index Google uses for searches on Google.com or any other of its owned and operated general search products. Google must make this information available to Qualified Competitors on a periodic basis to be determined by Plaintiffs in consultation with the TC. For clarity, in each periodic update Google will provide a full set of DocIDs and associated signals for the entire then-current information in

15

Google's Search Index. Nothing in this Section VI purports to transfer intellectual property rights of third parties to index users.

B.    <u>Publisher Opt-Out</u>: Google must provide online Publishers, websites, and content creators with an easily useable mechanism to selectively opt-out of having the content of their web pages or domains used in search indexing or used to train or fine-tune any of Google's GenAI models or GenAI Products (on a model-by-model basis). Google must enable online Publishers, websites, and content creators to opt-out of individual GenAI Products on a product-by-product basis without affecting the Publisher, website, or content creator's participation or inclusion in any other Google product or feature. Google must offer content creators on Google-owned sites (all Google owned or operated properties, including YouTube) the same opt-out provided to Publishers, websites, and content creators. Google must not retaliate against any Publisher, website, or content creator who opts-out pursuant to this Paragraph VI.B.

C.    <u>User-Side Data</u>: For the term of this Final Judgment, Google will make available, at marginal cost, to Qualified Competitors the following User-side Data on a non-discriminatory basis while safeguarding personal privacy and security, in addition to any data made available by Google via the APIs required under Sections VII and VIII:

1.    User-side Data used to build, create, or operate the GLUE statistical model(s);

2.    User-side Data used to train, build, or operate the RankEmbed model(s); and

3.    The User-side Data used as training data for GenAI Models used in Search or any GenAI Product that can be used to access Search.

16

Google must make this data available to Qualified Competitors on a periodic basis to be determined by Plaintiffs in consultation with the TC.

D.    <u>User-Side Data Sharing Administration</u>: Before this data specified in Paragraph VI.C is shared with Qualified Competitors, Google must use ordinary course techniques to remove any Personally Identifiable Information. Google must provide sufficient information for each dataset such that it can be reasonably understood by Qualified Competitors, including but not limited to a description of what the dataset contains, any sampling methodology used to create the dataset, and any anonymization or privacy-enhancing technique that was applied. Google will have up to six (6) months from the date of entry of this Final Judgment to implement the technology and provide any notice necessary to comply with this Section VI, and the six-month time period will start once Plaintiffs, in consultation with the TC, determine that the technology, including security and privacy safeguards, is fully functional.

E.    <u>Ads Data</u>: For the term of this Final Judgment, Google must provide Qualified Competitors, at marginal cost, the following Ads Data, in addition to any data made available by Google via the APIs required under Sections VII and VIII: Ads Data used to operate, build or train AdBrain models or other models used in Ads targeting, retrieval, assessing ad relevance, bidding, auctioning (including predicted click-through rates (pCTR)), formatting, or content generation.

F.    <u>Ads Data Sharing Implementation</u>: Before this data specified in Paragraph VI.E. is shared with Qualified Competitors, Google must use ordinary course techniques to remove any Personally Identifiable Information. Google must provide sufficient information for each dataset such it can be reasonably understood, including but not limited to a description of what the dataset contains, any sampling methodology used to create the dataset, and any anonymization or

privacy-enhancing technique that was applied. Google will have up to six (6) months from the

date of entry of this Final Judgment to implement the technology and provide any notice

necessary to comply with this Section VI, and the six-month time period will start once

Plaintiffs, in consultation with the TC, determine that the technology, including security and

privacy safeguards, is fully functional.

G.    No Circumvention Of This Section's Purposes: Google may not undertake any

action or omission with the purpose or effect of circumventing or frustrating the purposes of this

Section or any of its provisions. Complaints regarding non-compliance with this Section may be

referred to the TC for review in accordance with Paragraph X.C.3 below.

## VII.    REQUIRED SYNDICATION OF SEARCH RESULTS NECESSARY TO BUILD GSE QUALITY AND SCALE OF QUALIFIED COMPETITORS

The purposes of the remedies set forth in this Section are to remove barriers to entry, pry

open the monopolized markets to competition, and deprive Google of the fruits of its violations

by enabling Competitors to quickly erode Google's scale advantages, while also providing

incentives for those rivals and entrants to transition to independence. Google may not syndicate

its search results except as allowed by Section VII or otherwise approved by Plaintiffs.

A.    Search Syndication License: Google must take steps sufficient to make available

to any Qualified Competitor, at no more than the marginal cost of this syndication service, a

syndication license whose term will be ten (10) years from the date the license is signed, and

which will require Google, via real-time API(s), to make the following information and data

available in response to each query issued or submitted by a Qualified Competitor:

1.    Data sufficient to understand the layout, display, slotting, and ranking of

all items or modules on the SERP, including but not limited to the

mainline content and sidebar content and sitelinks and snippets;

2.    Ranked organic search results obtained from Google database or index, regardless of whether such web content was obtained by crawling the Internet or by other means;

3.    Search features that enable query corrections, modification, or expansion like spelling, synonyms, autocomplete, autosuggest, related search, "did you mean," "people also ask," and any other important query rewriting features identified by the TC;

4.    Local, Maps, Video, Images, and Knowledge Panel search feature content; and

5.    FastSearch results (fast top organic results).

The information provided pursuant to this Section must be the same as if the Qualified Competitor's query had been submitted through Google.com. It will be the Qualified Competitor's sole discretion to determine how much information to share with Google regarding the end-user.

B.    Syndication License Obligations: Google must provide the license on a non-discriminatory basis to any Qualified Competitor and may impose no restrictions on use, display, or interoperability with Search Access Points, including of GenAI Products, provided, however, that Google may take reasonable steps to protect its brand, its reputation, and security. Licensees may elect, in their sole discretion, which queries (some or all) for which they will request syndicated results and which syndication components to display or use and may do so in any manner they choose. Google may not place any conditions on how any licensee may use syndicated content under Paragraph VII.A, nor may Google retain, or use (in any way), syndicated queries or other information it obtains under Paragraph VII.A for its own products

and services. For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States.

C.    <u>Search Syndication License Terms</u>: The search syndication license must have the following additional features:

1.    Google will make syndicated content available via an API that provides responses with latency and reliability functionally equivalent to what Google provides for its own SERP.

2.    Syndication will start with significant access to the data required by Paragraph VII.A above and decline over the course of a 10-year period with an expectation that licensees will become independent of Google over time through investment in their own search capabilities. The scope of allowable syndication will be determined by the Plaintiffs in consultation with the TC.

3.    Google may not consent to licensees exceeding syndication limits set by Plaintiffs, and licensees must submit to the TC audits of syndication frequency.

D.    <u>Contingent Search Text Ads Syndication License Relief</u>: If, at least five (5) years after entry of this Final Judgment, if Plaintiffs demonstrate by a preponderance of the evidence that either or both monopolized markets have not experienced a substantial increase in competition, then Google must take steps sufficient to make available to any Qualified Competitor, at no more than the marginal cost of this syndication service, a syndication license whose term will be for the remainder of this Final Judgment and which makes available all components of its Search Text Ads product, including all types of Search Text Ads (including

any assets, extensions, or similar Search Text Ad variations) appearing on Google's SERP or available through Google's AdSense for Search. Google must make the purchase of ads syndicated under this Section available to advertisers on a nondiscriminatory basis comparable to Google's other Search Text Ads. For each syndicated ad result, Google must provide to the Qualified Competitor all Ads Data related to the result, provide the license on a non-discriminatory basis, and may impose no restrictions on use, display, or interoperability with Search Access Points, including of GenAI Products, provided, however, that Google may take reasonable steps to protect its brand, its reputation, and security. The Contingent Search Text Ads Syndication License relief is separate from, and in addition to, the Search Text Ads Syndication remedy provided in Paragraph VIII.E, except that the Contingent Search Text Ads Syndication License must, if implemented, comply with Paragraph VIII.E.

    E.    <u>Synthetic Queries</u>: Google must permit, at marginal cost, Qualified Competitors to submit synthetic or simulated queries, and Google must provide results in the same format as the results provided in the API required in this Section VII. The Qualified Competitor will be entitled to log and use (in any way) Google's results, including ads and anything else that would appear on a Google SERP. The maximum number of allowable synthetic queries will be determined by the Plaintiffs in consultation with the TC.

    F.    <u>No Restraints On Use For Other Purposes:</u> Google must permit, and must not limit or otherwise restrain, Qualified Competitors from using the information and services obtained under this Section VII for any purpose related to general search or general search text advertising.

G.    <u>Existing Syndication Agreements</u>: The provisions of this Section VII will have no effect on any existing Google syndication agreements with third parties or on its ability to enter into syndication contracts with third parties other than Qualified Competitors, except that:

1.    Google must permit any entity with an existing syndication agreement who becomes a Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section VII.

2.    Google must comply with Paragraph VII.A for all existing syndication agreements between Google and third-party GSEs by the earlier of two (2) years from the Effective Date or the term of any existing syndication contract.

3.    For any existing or future Google agreements licensing or syndicating any search or search ads products to a Competitor, Google cannot:

a)    Enforce any provisions restricting use, display, or interoperability with Search Access Points, including of GenAI Products, provided, however, that Google may take reasonable steps to protect its brand, its reputation, and security. For example, licensees may elect, in their sole discretion, which queries (some or all) for which they will request syndicated results and which syndication components to display or use and may do so in any manner they choose.

b)    Retain or use (in any way) syndicated queries or other information it obtains from Competitors for its own products and services.

H.    <u>No Circumvention Of This Section's Purposes</u>: Google may not undertake any action or omission with the purpose or effect of circumventing or frustrating the purposes of this Section or any of its provisions. Complaints regarding non-compliance with this Section may be referred to the TC for review in accordance with Paragraph X.C.3 below.

## VIII.    SEARCH TEXT AD TRANSPARENCY AND REDUCTION OF SWITCHING COSTS

The purposes of the remedies set forth in this Section are to reduce entry barriers, afford advertisers better data to inform product choices, and pry open the monopolized markets to competition, including by providing advertisers with information and options providing visibility into the performance and cost of their Google Search Text Ads and by providing the necessary ability to optimize their advertising, including by purchasing Search Text Ads from Google Competitors.

A.    <u>Search Query Report</u>: For each Search Text Ad served or clicked, Google must make available to advertisers at the individual ad level for the preceding 18-month period, data showing the query, keyword trigger, match type, cost-per-click (CPC), click-through rate (CTR), SERP positioning, long-term value (LTV), conversion data, and any other metric necessary for the advertiser to evaluate its ad performance. This data must be made available through an API that permits advertisers to download raw data in real time, generate reports and summaries, and perform other analytical functions to assess ad spend, ad performance, and in-campaign optimization (including the ability to assess incremental clicks generated by Search Text Ads). This data must also be provided to advertisers through periodic (at least monthly) autogenerated summaries accessible through the Google ads system interface.

B.    <u>Keyword Matching</u>: Google must make available to advertisers a keyword matching option such that, when an advertiser chooses this matching option for a given keyword,

the advertiser's ad will be eligible for the ad auction only when a query's content exactly matches with no variation to the keyword selected by the advertiser. This same matching option must also be made available for use with negative keywords.

C.     <u>Access To Data Reports</u>: Google must not limit the ability of advertisers to export in real time (by downloading through an interface or API access) data or information relating to their entire portfolio of ads or advertising campaigns bid on, placed through, or purchased through Google, including data relating to placement or performance (including conversion and conversion value data). The data made available must include all of the information contained in or used by Google in its Google Analytics, Ads Data Hub, Google Ads Data Manager, BigQuery, or Store sales and visitor measurement products, on the most granular and detailed level.

D.     <u>Search Text Ads Auction Changes</u>: On a monthly basis, Google must provide the TC and Plaintiffs a report outlining all changes made to its Search Text Ads auction in the preceding month, provide (1) Google's public disclosure of that change or (2) a statement why no public disclosure is necessary, and further identify each change which Google considers material. Plaintiffs have the right to challenge any disclosure they deem inadequate.

E.     <u>Search Text Ads Syndication</u>: Google must take steps sufficient to make available to any Qualified Competitor a Search Ads Syndication License whose term will be ten (10) years from the date the license is signed, providing latency, reliability, and performance functionally equivalent to what Google provides for Search Text Ads on its own SERP, and available to Qualified Competitors on financial terms no worse than those offered to any other user of Google's Search Text Ads syndication products, e.g. AdSense for Search, or any other current or future products offering syndicated Search Text Ads. It will be the Qualified Competitor's sole

discretion to determine how much information to share with Google regarding the end-user. Search Text Ads syndication licenses to Qualified Competitors must include all types of Search Text Ads (including any assets, extensions, or similar Search Text Ad variations) appearing on Google's SERP or available through its syndication products. Google must make the purchase of ads syndicated under this Paragraph available to advertisers on a nondiscriminatory basis comparable to, and no more burdensome than, the availability of Google's other Search Text Ads, must include Qualified Competitors in its Search Partner Network, and must also provide advertisers the option to appear on each individual Qualified Competitor's sites on a site-by-site basis (i.e. an advertiser can choose to appear as a syndicated result on a Qualified Competitor's site regardless of whether it opts into the Search Partner Network or chooses to appear on any other site, including Google.com). For each syndicated ad result, Google must provide to the Qualified Competitor all Ads Data related to the ads provided to the Qualified Competitor, including the identity of the advertiser and CPC paid, and conversion data where available, without restrictions on use of the Ads Data including restrictions on using it to market or solicit advertisers for the Qualified Competitors' own advertising products. For ads syndicated to Qualified Competitors, Google may impose no restrictions on use, display, or interoperability with Search Access Points, including of GenAI Products, provided, however, that Google may take reasonable steps to protect its brand, its reputation, and security. Google may not place any conditions on how any Qualified Competitor may use or display syndicated content under this Paragraph VIII.E, including on scraping, indexing, or crawling the syndicated results. For example, licensees may elect, in their sole discretion, which queries (some or all) for which they will request syndicated Search Text Ads and which syndication components to display or use and may do so in any manner they choose. Qualified Competitors must have the right to set a

minimum CPC for ads syndicated under this Paragraph VIII.E to appear on their website. Google

may not retain or use (in any way) syndicated queries or other information it obtains under this

Paragraph VIII.E for its own products and services. For the avoidance of doubt, Google must

only provide syndication for queries that originate in the United States.

F.    No Circumvention Of This Section's Purposes: Google may not undertake any

action or omission with the purpose or effect of circumventing or frustrating the purposes of this

Section or any of its provisions. Complaints regarding non-compliance with this Section may be

referred to the TC for review in accordance with Paragraph X.C.3 below.

## IX.    CHOICE SCREENS ON EXISTING NON-APPLE DEVICES, GOOGLE DEVICES, AND GOOGLE BROWSERS

The purposes of the remedies set forth in this Section are to unfetter the markets from

Google's illegal monopolization and deprive it of the fruits of its violations by informing users,

including those accustomed to Google's default status on their existing Devices and Google

Devices, of the competitive choices for GSEs. The remedies in this Section are further intended

to limit Google's ability to enter into or continue its anticompetitive distribution agreements.

A.    Choice Screens For Google Search Access Points On Existing Non-Apple, Third-

Party Devices: For every Google Search Access Point that was preinstalled on a non-Apple,

third-party Device under a distribution agreement before the date of entry of this Final Judgment,

Google must offer the Distributor the option to display (1) a Search Access Point Choice Screen

(if the Search Access Point Choice Screen includes a Google Browser as an option and the

Google Browser is selected, then a Default Search Engine Choice Screen must be shown for the

Google Browser) or (2) a Search Default Choice Screen (if Google has already shown a Search

Default Choice Screen for another Search Access Point on that Device, Google may apply the

previous selection to each Search Access Point), to any user who has Google as their default

GSE on that Search Access Point. For each Device displaying such Choice Screens, the Distributor shall receive from Google for the remaining life of the Device or one (1) year, whichever is shorter, a fixed monthly payment equal to the average monthly amount that Google paid to the Distributor for that Device during the shorter of the 12-month period prior to the date of entry of this Final Judgment or the lifetime of the Device.

B.    <u>Choice Screens For Search Access Points On Google Devices</u>: On new Google Devices, Google may display a Search Access Point Choice Screen or may preinstall a Google Search Access Point that implements a Default Search Choice Screen (if the Search Access Point Choice Screen includes a Google Browser as an option and the Google Browser is selected, then a Default Search Engine Choice Screen must be shown for the Google Browser). For each Search Access Point preinstalled on an existing Google Device before the date of entry of this Final Judgment, Google must (a) implement a Default Search Choice Screen or a Search Access Point Choice Screen (if the Search Access Point Choice Screen includes a Google Browser as an option and the Google Browser is selected, then a Default Search Engine Choice Screen must be shown for the Google Browser) or (b) delete—or, if undeletable, remove the visual representation of—the Search Access Point.

C.    <u>Choice Screens On Google Browsers</u>: Google must display a Search Default Choice Screen on every new and existing instance of a Google Browser where the user has not previously affirmatively selected a default GSE for that Google Browser, including by changing the search default through the settings.

D.    <u>Choice Screens</u>: Google must disclose each Choice Screen, the related distribution agreement, if relevant, and its plan for implementing that Choice Screen to Plaintiffs and the TC at least sixty (60) days in advance of the Choice Screen being displayed to any user.

After consultation with a behavioral scientist, the TC will report to Plaintiffs whether each Choice Screen satisfies these requirements, and ultimately Plaintiffs must approve any Choice Screen offered pursuant to this Final Judgment. Plaintiffs, in consultation with the TC, may require modifications to any Choice Screen over time. Any choice screen provided for in this Final Judgment must be designed to not preference Google, to be accessible, to be easy to use, and to minimize choice friction, based on empirical evidence of user behavior.

1.    "Search Access Point Choice Screen" means a choice screen that appears on a Device and is no more favorable to Google than a choice screen with the following characteristics (e.g., a choice screen may be randomized or may show a Competitor in the top position every time rather than having the options appear in random order):

a)    for a Google Device, five options qualify to appear on the choice screen: a single Google-owned Search Access Point, the Device's current default Search Access Point (if applicable), and the three-to-four (as applicable) consenting rival Search Access Points of the same type with the highest U.S. market shares;

b)    for a non-Google Device, a single Google-owned Search Access Point and three-to-five rival Search Access Points selected by the Distributor appear as options on the choice screen;

c)    the options appear in random order (1) at the device's first use, including after a factory reset; and (2) if the user has not otherwise seen the choice screen within the previous 90 days, at the device's

first use on or after a fixed, yearly date coordinated across all

Choice Screens; and

d)    the user can return to the choice screen at any time by selecting a

reasonably accessible setting.

2.    "Search Default Choice Screen" means a choice screen that appears on a

Search Access Point and is no more favorable to Google than a choice

screen with the following characteristics (e.g., a choice screen may be

randomized or may show a Competitor in the top position every time

rather than having the options appear in random order):

a)    for a Google Search Access Point, five options qualify to appear on

the choice screen: a single Google-owned GSE, the current default

search engine (if applicable), and the three-to-four (as applicable)

consenting rival GSEs with the highest U.S. market shares;

b)    for a non-Google Search Access Point, a single Google-owned

GSE and three-to-five rival GSEs selected by the Search Access

Point company appear as options on the choice screen;

c)    the options appear in random order (1) at the Search Access

Point's first use, including after a factory reset; (2) if the user has

not otherwise seen the choice screen within the previous 90 days,

at the Search Access Point's first use on or after a fixed, yearly

date coordinated across all Choice Screens;

d)     the GSE selected on the choice screen becomes the Search Access Point's default GSE for those user queries and prompts that result in the display of web links; and

e)     the user can return to the choice screen at any time by selecting a reasonably accessible setting.

E.     [The following provisions in this Paragraph IX.E are proposed solely by the Colorado Plaintiff States. Plaintiff United States and its Co-Plaintiff States do not join in proposing these remedies.] Public Education Fund: Google will fund a nationwide advertising and education program designed to inform users of the outcome of this litigation, the remedies in this Final Judgment, the purpose of the remedies to restore competition and improve consumer choice, and the mechanisms available to consumers to exercise choice in the selection of GSEs. The Public Education Fund will be designed to best advance the ability of consumers to make informed choices. The TC shall assess the design and funding level of the Public Education Fund for the approval of the Colorado Plaintiff States and subsequent review of this Court. In its work, the TC shall assess the role of short-term incentive payments in achieving the goals of the Public Education Fund. Nothing in this program will limit the ability of consumers to change any Search Access Point or a search default on a Search Access Point, at any time as they choose.

F.     No Circumvention Of This Section's Purposes: Google may not undertake any action or omission with the purpose or effect of circumventing or frustrating the purposes of this Section or any of its provisions. Complaints regarding non-compliance with this Section may be referred to the TC for review in accordance with Paragraph X.C.3 below.

## X.    EFFICIENT, EFFECTIVE, AND ADMINISTRABLE MONITORING AND ENFORCEMENT

The purposes of the remedies set forth in this Section are to ensure the efficient, effective, and administrable monitoring and enforcement of this decree.

A.    <u>Technical Committee</u>:

1.    Within thirty (30) days of entry of this Final Judgment, the Court will appoint, pursuant to the procedures below, a five-person Technical Committee ("TC") to assist in enforcement of and compliance with this Final Judgment.

2.    The TC members must be experts in some combination of software engineering, information retrieval, artificial intelligence, economics, and behavioral science. No TC member may have a conflict of interest that could prevent them from performing their duties in a fair and unbiased manner. In addition, unless Plaintiffs specifically consent, no TC member:

a)    may have been employed in any capacity by Google or any Competitor to Google within the six-month period directly predating their appointment to the TC;

b)    may have been retained as a consulting or testifying expert by any party in this action; or

c)    may perform any work for Google or any Competitor of Google during the time that they serve on the TC and for one (1) year after ceasing to serve on the TC.

3.    Within seven (7) days of entry of this Final Judgment, Plaintiff United States (after consultation with the Co-Plaintiff States), the Colorado

Plaintiff States, and Google will each select one member of the TC, and a majority of those three members will then select the remaining two members. Plaintiff United States' appointee will serve as chair. The selection and approval process will be as follows:

a)     As soon as practicable after submission of this Final Judgment to the Court, the Plaintiffs as a group will identify to Google the individuals they propose to select as their designees to the TC, and Google will identify to Plaintiffs the individual it proposes to select as its designee. No party may object to a selection on any ground other than failure to satisfy the requirements of Paragraph X.A.2 above. Any such objection must be made within ten (10) business days of the receipt of notification of selection.

b)     The Plaintiffs will apply to the Court for appointment of the persons selected pursuant to Paragraph X.A.3.a) above. Any objections to the eligibility of a selected person that the parties have failed to resolve between themselves will be decided by the Court based solely on the requirements stated in Paragraph X.A.2 above.

c)     As soon as practicable after their appointment by the Court, the three members of the TC selected by the Plaintiffs and Google (the "Standing Committee Members") will identify to the Plaintiffs and Google the persons that they in turn propose to select as the remaining members of the TC. The Plaintiffs and Google must not

object to these selections on any grounds other than failure to satisfy the requirements of Paragraph X.A.2 above. Any such objection must be made within ten (10) business days of the receipt of notification of the selection and must be served on the other party as well as on the Standing Committee Members.

d)      The Plaintiffs will apply to the Court for appointment of the persons selected by the Standing Committee Members. If the Standing Committee Members cannot agree on the fourth or fifth members of the TC, that member or members will be appointed by the Court. Any objection by Plaintiffs or Google to the eligibility of the person selected by the Standing Committee Members which the parties have failed to resolve among themselves will also be decided by the Court based solely on the requirements stated in Paragraph X.A.2 above.

4.      The Standing Committee Members will serve for an initial term of thirty-six (36) months; the remaining members will serve for an initial term of thirty (30) months. At the end of a TC member's term, the party that originally selected them may, in its sole discretion, either request re-appointment by the Court to additional terms of the same length, or replace the TC member in the same manner as provided for in Paragraph X.A.3 above. In the case of the fourth and fifth members of the TC, those members will be re-appointed or replaced in the manner provided in Paragraph X.A.3 above.

5.    If Plaintiffs determine that a member of the TC has failed to act diligently and consistently with the purposes of this Final Judgment, or if a member of the TC resigns, or for any other reason ceases to serve in their capacity as a member of the TC, the person or persons that originally selected the TC member will select a replacement member in the same manner as provided for in Paragraph X.A.3 above.

6.    Promptly after appointment of the TC by the Court, the Plaintiffs will enter into a Technical Committee Services Agreement ("TC Services Agreement") with each TC member that grants the rights, powers, and authorities necessary to permit the TC to perform its duties under this Final Judgment. Google must indemnify each TC member and hold them harmless against any losses, claims, damages, liabilities or expenses arising out of, or in connection with, the performance of the TC's duties, except to the extent that such liabilities, losses, damages, claims, or expenses result from misfeasance, gross negligence, willful or wanton acts, or bad faith by the TC member. The TC Services Agreements must include the following:

a)    The TC members will serve, without bond or other security, at the cost and expense of Google on such terms and conditions as the Plaintiffs approve, including the payment of reasonable fees and expenses.

b)      The TC Services Agreement will provide that each member of the

TC must comply with the limitations provided for in

Paragraph X.A.2 above.

7.      The TC must have the following powers and duties:

a)      The TC will have the power and authority to monitor Google's

compliance with its obligations under this Final Judgement.

b)      The TC will have the power to recommend reasonable data

security standards applicable to Qualified Competitors, which will

be approved by the Plaintiffs.

c)      The TC will have the power to evaluate Choice Screens and

recommend to Plaintiffs whether they comply with this Final

Judgment.

d)      The TC may, on reasonable notice to Google:

(1)      interview, either informally or on the record, any Google

personnel, who may have their individual counsel present;

any such interview will be subject to the reasonable

convenience of such personnel and without restraint or

interference by Google;

(2)      inspect and copy any document in the possession, custody,

or control of Google personnel;

(3)      obtain reasonable access to any system or equipment to

which Google personnel have access;

(4)    obtain reasonable access to, and inspect, any physical facility, building or other premises to which Google personnel have access; and

(5)    require Google personnel to provide documents, data and other information, and to submit reports to the TC containing such material, in such form as the TC may reasonably direct.

e)    The TC will have access to Google's source code and algorithms, subject to a confidentiality agreement, as approved by the Plaintiffs and to be agreed to by the TC members pursuant to Paragraph X.A.8 below, and by any staff or consultants who may have access to the source code and algorithms. The TC may study, interrogate and interact with the source code and algorithms in order to perform its functions and duties, including the handling of complaints and other inquiries from third parties.

f)    The TC will receive complaints from Google's Compliance Officer (as described in Paragraph X.B below), third parties, or the Plaintiffs and handle them in the manner specified in Paragraph X.C below.

g)    The TC must report in writing to the Plaintiffs, initially every three (3) months for three (3) years and thereafter every six (6) months until expiration of this Final Judgment, the actions it has undertaken in performing its duties pursuant to this Final

Judgment, including the identification of each business practice reviewed and any recommendations made by the TC.

h)    Regardless of when reports are due, when the TC has reason to believe that there may have been a failure by Google to comply with any term of this Final Judgment, or that Google is attempting to circumvent any provision of this Final Judgment or the intended purposes of this Final Judgment, the TC must immediately notify the Plaintiffs in writing setting forth the relevant details.

i)    TC members may communicate with third parties about how their complaints or inquiries might be resolved with Google, so long as the confidentiality of information obtained from Google is maintained.

j)    The TC may hire at the cost and expense of Google, with prior notice to Google and subject to approval by the Plaintiffs, such staff or consultants (all of whom must meet the qualifications of Paragraphs X.A.2.a-c) as are reasonably necessary for the TC to carry out its duties and responsibilities under this Final Judgement. The compensation of any person retained by the TC will be based on reasonable and customary terms commensurate with the individual's experience and responsibilities.

k)    The TC must account for all reasonable expenses incurred, including agreed upon fees for the TC members' services, subject to the approval of the Plaintiffs. Google's failure to promptly pay

37

the TC's accounted-for costs and expenses, including for agents

and consultants, will constitute a violation of this Final Judgment

and may result in sanctions imposed by the Court. Google may, on

application to the Court, object to the reasonableness of any such

fees or other expenses only if Google has conveyed such

objections to the Plaintiffs and the TC within ten (10) calendar

days of receiving the invoice for such fees or other expenses. On

any such application, (a) Google will bear the burden to

demonstrate unreasonableness; (b) Google must establish an

escrow account into which it deposits the disputed costs and

expenses until the dispute is resolved; and (c) the TC members will

be entitled to recover all costs incurred on such application

(including reasonable attorneys' fees and costs), regardless of the

Court's disposition of such application, unless the Court expressly

finds that the TC's opposition to the application was without

substantial justification.

l)     *[The following provision in Paragraph X.A.7.l is proposed solely*

   *by the Colorado Plaintiff States. Plaintiff United States and its Co-*

   *Plaintiff States do not join in proposing this remedy.]* The TC will

   have the power to implement the Public Education Fund as

   provided for in Paragraph IX.E above.

8.     Each TC member, and any consultants or staff hired by the TC, must sign

   a confidentiality agreement prohibiting disclosure of any information

obtained in the course of performing his or her duties as a member of the TC or as a person assisting the TC, to anyone other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, or the Court. All information gathered by the TC in connection with this Final Judgment and any report and recommendations prepared by the TC must be treated as Highly Confidential under the Protective Order in this case, and must not be disclosed to any person other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, and the Court except as allowed by the Protective Order entered in the Action or by further order of this Court. No member of the TC may make any public statements relating to the TC's activities.

B.  Internal Compliance Officer:

1.  Google must designate, within thirty (30) days of entry of this Final Judgment, an employee of Google as the internal Compliance Officer with responsibility for administering Google's antitrust compliance program and helping to ensure compliance with this Final Judgment.

2.  Within seven (7) days of the Compliance Officer's appointment, Google must identify to the Plaintiffs the Compliance Officer's name, business address, telephone number, and email address. Within fifteen (15) days of a vacancy in the Compliance Officer position, Google must appoint a replacement and identify to the Plaintiffs the replacement Compliance Officer's name, business address, telephone number, and email address.

Google's initial or replacement appointment of the Compliance Officer is subject to the approval of the Plaintiffs.

3. The Compliance Officer must supervise the review of Google activities to ensure that they comply with this Final Judgment. The Compliance Officer may be assisted by other employees of Google.

4. The Compliance Officer must be responsible for performing the following activities:

   a) within thirty (30) days after entry of this Final Judgment, distributing a copy of the Final Judgment to all officers and employees of Google;

   b) distributing a copy of this Final Judgment to any person who succeeds to a position described in Paragraph X.B.4.a above within thirty (30) days of the date the person starts that position;

   c) ensuring that those persons designated in Paragraph X.B.4.a above are annually trained on the meaning and requirements of this Final Judgment and the U.S. antitrust laws and advising them that Google's legal advisors are available to confer with them regarding any question concerning compliance with this Final Judgment or the U.S. antitrust laws;

   d) obtaining from each person designated in Paragraph X.B.4.a above an annual written certification that he or she: (i) has read and agrees to abide by the terms of this Final Judgment; and (ii) has

40

been advised and understands that his or her failure to comply with this Final Judgment may result in a finding of contempt of court;

e)    maintaining a record of all persons to whom a copy of this Final Judgment has been distributed and from whom the certification described in Paragraph X.B.4.d above has been obtained;

f)    ensuring that all employees, and all new employees, receive a copy of this Final Judgment and receive annual training on compliance with the U.S. antitrust laws (the Compliance Officer will be responsible for approving the content, schedule, and scope of delivery of compliance training within Google with respect to: compliance with the decree itself; U.S. antitrust laws; and obligations to preserve and produce materials for use in investigations, litigations, or regulatory proceedings);

g)    annually communicating to all employees that they may disclose to the Compliance Officer, without reprisal for such disclosure, information concerning any violation or potential violation of this Final Judgment or the U.S. antitrust laws by Google, and establishing a confidential avenue for any employee to report potential violations;

h)    establishing and maintaining the website provided for in Paragraph X.C.2.a below;

i)    receiving complaints from third parties, the TC, and the Plaintiffs concerning Google's compliance with this Final Judgment and

41

following the appropriate procedures set forth in Paragraph X.C below;

j)    maintaining a record of all complaints received and action taken by Google with respect to each such complaint; and

k)    ensuring employees retain all relevant documents and electronically stored information, regardless of medium or form, related to this Final Judgement and all complaints received and or action taken by Google with respect to any complaint.

5.    Google must withing thirty (30) days further appoint a senior business executive, who has visibility into any Google entity with obligations under this Final Judgment, who Google will make available to update the Court on Google's compliance at regular status conferences or as otherwise ordered.

6.    Google will retain (if it has not already) a licensed attorney in good standing in California to collect documents and interview employees and generally review Google's document retention practices and Google's compliance with its legal discovery obligations under this case and final judgment. This attorney will be retained for a term no shorter than eighteen (18) months. This attorney (and any team this attorney assembles) will present to the Audit and Compliance Committee (or any successor Board Committee) on the retention of documents and Google's compliance with its discovery obligations.

C.    <u>Voluntary Dispute Resolution</u>:

1.    Third parties may submit complaints concerning Google's compliance with this Final Judgment to the Plaintiffs, the TC, or the Compliance Officer.

2.    Third parties, the TC, or Plaintiffs in their discretion may submit to the Compliance Officer any complaints concerning Google's compliance with this Final Judgment. Without in any way limiting their authority to take any other action to enforce this Final Judgment, the Plaintiffs may submit complaints to the Compliance Officer whenever doing so would be consistent with the public interest.

a)    To facilitate the communication of complaints and inquiries by parties, the Compliance Officer must place on Google's website, in a manner acceptable to the Plaintiffs, the procedures for submitting complaints. To encourage whenever possible the informal resolution of complaints and inquiries, the website must provide a mechanism for communicating complaints and inquiries to the Compliance Officer.

b)    Google has thirty (30) days after receiving a complaint to attempt to resolve or to reject it.

c)    Within thirty (30) days of receiving a complaint, the Compliance Officer must advise the TC and the Plaintiffs of the nature of the complaint and its disposition. The TC may then propose to the

Plaintiffs further actions consistent with this Final Judgment, including consulting with Plaintiffs regarding the complaint.

3. The Compliance Officer, third parties, or the Plaintiffs in their discretion may submit to the TC any complaints concerning Google's compliance with this Final Judgment.

   a) The TC must investigate complaints it receives and will consult with the Plaintiffs regarding its investigation. At least once during its investigation, and more often when it may help resolve complaints informally, the TC will meet with the Compliance Officer to allow Google to respond to the substance of the complaint and to determine whether the complaint can be resolved without further proceedings.

   b) Following its investigation, the TC will advise Google and the Plaintiffs of its conclusion and its proposal for cure.

   c) Reports and recommendations from the TC may be received into evidence by the Court in connection with any effort by any Plaintiff to enforce this Final Judgment but must not be otherwise made available in any other court or tribunal related to any other matter. No member of the TC will be required to testify by deposition, in court, or before any other tribunal regarding any matter related to this Final Judgment.

d)    The TC may preserve the anonymity of any third-party

complainant where it deems it appropriate to do so upon the

request of the Plaintiffs or the third party, or in its discretion.

D.    <u>Compliance Inspection</u>:

1.    Without in any way limiting the sovereign enforcement authority of each

of the Colorado Plaintiff States, the Colorado Plaintiff States will form a

committee to coordinate their enforcement of this Final Judgment. Neither

a Co-Plaintiff State nor a Colorado Plaintiff State may take any action to

enforce this Final Judgment without first consulting with the United States

and with the Colorado Plaintiff States' enforcement committee.

2.    For the purposes of determining or securing compliance with this Final

Judgment or of determining whether this Final Judgment should be

modified or vacated, upon written request of an authorized representative

of the Assistant Attorney General for the Antitrust Division (after

consultation with the Co-Plaintiff States and the Colorado Plaintiff States'

enforcement committee) or of the Attorney General of a Co-Plaintiff State

or the Attorney General of a Colorado Plaintiff State (after consultation

with the United States and the Colorado Plaintiff States' enforcement

committee), as the case may be, and reasonable notice to Google, Google

must permit, from time to time and subject to legally recognized

privileges, authorized representatives, including agents retained by any

Plaintiff:

    a)     to have access during Google's office hours to inspect and copy, or at the option of the Plaintiff, to require Google to provide electronic copies of all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Google relating to any matters contained in this Final Judgment; and

    b)     to interview, either informally or on the record, Google's officers, employees, or agents, who may have their individual counsel present, relating to any matters contained in this Final Judgment. The interviews must be subject to the reasonable convenience of the interviewee and without restraint or interference by Google.

3.     Upon the written request of an authorized representative of the Assistant Attorney General for the Antitrust Division (after consultation with the Co-Plaintiff States and the Colorado Plaintiff States' enforcement committee) or of the Attorney General of a Co-Plaintiff State or the Attorney General of a Colorado Plaintiff State (after consultation with the United States and the Plaintiff States' enforcement committee), Google must submit written reports or respond to written interrogatories, under oath if requested, relating to any matters contained in this Final Judgment.

E.    <u>Anti-Retaliation</u>: Google must not retaliate in any form against a person because it is known to Google that the person is or is contemplating:

1.     developing, distributing, promoting, syndicating, using, selling, offering, or licensing any product or service that competes with—or facilitates

competition with—a Google-affiliated GSE or a Google-affiliated Search Text Ads product;

2. filing a complaint related to Google's compliance with this Final Judgment;

3. testifying, assisting, cooperating with, or participating in any manner in an investigation, proceeding, hearing, or litigation related to Google's compliance with this Final Judgment; or

4. exercising any of the options or alternatives provided for under this Final Judgment.

F. <u>Anti-Circumvention</u>: Google is enjoined from enforcing or complying with any provision in any existing or future contract, agreement, or understanding which is otherwise prohibited by this Final Judgment.

1. Google must not (i) engage in any conduct designed to replicate the effect of any behavior found by the Court to violate the Sherman Act; (ii) engage in any conduct substantially similar to conduct prohibited by another Section of this Final Judgment or designed to evade any obligation imposed by this Final Judgment; or (iii) engage in any conduct with the purpose or effect of evading or frustrating the intended purposes of this Final Judgment.

2. For the avoidance of doubt, the provisions in this Paragraph X.F are worldwide in scope and are applicable to Google's conduct or contracts regardless of where it occurred or purports to apply.

47

G.    <u>No Circumvention Of This Section's Purposes</u>: Google may not undertake any action or omission with the purpose or effect of circumventing or frustrating the purposes of this Section or any of its provisions. Complaints regarding non-compliance with this Section may be referred to the TC for review in accordance with Paragraph X.C.3 below.

## XI.    RETENTION OF JURISDICTION AND ENFORCEMENT OF FINAL JUDGMENT

A.    Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders or directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any of its provisions (including an order to divest any relevant Google business), for the enforcement of compliance with this Final Judgment, and for the punishment of any violation of this Final Judgment. In any motion to modify this Final Judgment, Plaintiffs need not show any change in circumstances, but need only demonstrate that modification is necessary to achieve the intended purposes of this Final Judgment to restore competition in the monopolized markets. In any action to enforce this Final Judgment, Google must show by a preponderance of the evidence that its actions are in compliance with this Final Judgment.

B.    The Court may act *sua sponte* to issue orders or directions for the construction or carrying out of this Final Judgment, for the enforcement of compliance, and for the punishment of any violation.

C.    This Final Judgment should be interpreted to give full effect to the procompetitive purposes of the U.S. antitrust laws and to restore the competition the Court found was harmed by Google's illegal conduct.

D.    For a period of four (4) years following the expiration of this Final Judgment, if any Plaintiff has evidence that Google violated this Final Judgment before it expired, that

Plaintiff may file an action against Google in this Court requesting that the Court order
(1) Google to comply with the terms of this Final Judgment for an additional term of at least four
(4) years following the filing of the enforcement action; (2) all appropriate contempt remedies;
and (3) additional relief needed to ensure Google complies with the terms of this Final Judgment.

      E.      In connection with a successful effort by any Plaintiff to enforce this Final
Judgment against Google, whether litigated or resolved before litigation, Plaintiff may request
that the Court order Google to reimburse that Plaintiff for the fees and expenses of its attorneys,
as well as all other costs, including experts' fees, incurred in connection with that effort to
enforce this Final Judgment, including in the investigation of the potential violation.

## XII.   EFFECTIVE DATE AND EXPIRATION OF FINAL JUDGMENT

      This Final Judgment will take effect thirty (30) days after the date on which it is entered
(the "Effective Date"), and Plaintiffs must report the date on which Google has substantially
implemented all provisions of this Final Judgment. Unless the Court grants an extension or early
termination is granted, this Final Judgment will expire ten (10) years from the Effective Date.
This Final Judgment may be terminated upon notice by the United States (after consultation with
the Co-Plaintiff States), the Colorado Plaintiff States' enforcement committee, and Google that
continuation of this Final Judgment is no longer necessary to restore competition in the
monopolized markets. Alternatively, if Google has complied with all terms of this Final
Judgment for at least the preceding five (5) years and if Google's Competitors' combined market
share in U.S. GSEs, as measured by the six-month moving medians of two industry standards,
agreed upon by Google and the Plaintiffs, is greater than 50% (excluding all syndicated queries),
Google may petition the Court to terminate this Final Judgment on the grounds that competition

in both relevant markets has increased so substantially that this Final Judgment is no longer

needed.

## XIII.  THIRD-PARTY RIGHTS

Nothing in this Final Judgment is intended to confer upon any other persons any rights or

remedies of any nature whatsoever or by reason of this Final Judgment other than the right to

submit complaints to the Compliance Officer and the TC.

## XIV.  FEES AND COSTS

Plaintiffs are prevailing parties in this litigation. Google is ordered to pay Plaintiff United

States' costs, the Co-Plaintiff States' reasonable attorneys' fees and costs, and the Colorado

Plaintiff States' reasonable attorneys' fees and costs.


Date: _____


_____
Judge Amit Mehta
United States District Judge

Attachment B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *et al.*,

> Plaintiffs,

v.

GOOGLE LLC,

> Defendant.

Case No. 1:20-cv-03010-APM

HON. AMIT P. MEHTA

STATE OF COLORADO, *et al.*,

> Plaintiffs,

v.

GOOGLE LLC,

> Defendant.

Case No. 1:20-cv-03715-APM

HON. AMIT P. MEHTA

## PLAINTIFFS' ~~INITIAL~~REVISED PROPOSED FINAL JUDGMENT

WHEREAS, Plaintiffs United States of America, and the States and Commonwealths of Arkansas, California, Georgia, Florida, Indiana, Kentucky, Louisiana, Michigan, Missouri, Mississippi, Montana, South Carolina, Texas, and Wisconsin, by and through their respective Attorneys General ("Co-Plaintiff States"), filed their Complaint on October 20, 2020, and their Amended Complaint on January 15, 2021;

AND WHEREAS, Plaintiffs Colorado, Nebraska, Arizona, Iowa, New York, North Carolina, Tennessee, Utah, Alaska, Connecticut, Delaware, District of Columbia, Guam, Hawaii, Idaho, Illinois, Kansas, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico,

Rhode Island, South Dakota, Vermont, Virginia, Washington, West Virginia, and Wyoming (together "Colorado Plaintiff States") filed their Complaint on December 17, 2020;

AND WHEREAS, the Court conducted a trial and entered Findings of Fact and Conclusions of Law in both actions on August 5, 2024;

AND WHEREAS, the Court entered judgment finding Google liable for violating Section 2 of the Sherman Act by unlawfully maintaining its monopolies in the general search services and general search text advertising markets;

NOW THEREFORE, upon the record at trial and all prior and subsequent proceedings, it is hereby ORDERED, ADJUDGED, AND DECREED:

## I. JURISDICTION

The Court has jurisdiction over the subject matter of this action and over Google.

## II. APPLICABILITY

This Final Judgment applies to Google, as defined below, and to all other persons in active concert or participation with Google who have received actual notice of this Final Judgment by personal service or otherwise.

## III. DEFINITIONS

As used in this Final Judgment:

A.    "Ads Data" means data related to Google's selection, ranking, and placement of, Search Text Ads in response to queries, including any User-side Data used in that process.

B.A.    "AI Product" means any application, service, feature, tool, or functionality that involves artificial intelligence capabilities.

C.B.    "Android" means all code, software, applications, application programming interfaces (APIs), and other products and services provided by Google through the Android Open

Source Project (AOSP), including the open-source application framework, libraries, runtime, and kernel, which are published at http://source.android.com (or successor sites), and any software development kits made available at http://developer.android.com (or successor sites) and all code, software, applications, APIs, and other products and services provided by Google that are critical, ~~in~~as informed by the ~~determination~~views of the Technical Committee, to the full and proper functioning of an Android Device. For the purposes of this Final Judgment, Android also includes (1) the Google Play Store and Google Play Services; (2) all other code, software, applications, APIs, and products and services provided by Google that are critical, ~~in~~as informed by the ~~determination~~views of the Technical Committee, to the full and proper functioning of the Google Play Store and Google Play Services; and (3) all code, software, applications, APIs, and other products and services that Google adds to open-source Android to implement the operating system (OS) on Pixel Devices.

~~D.~~C.    "API" or "application programming interface" means a mechanism that allows different software components to communicate with each other.

~~E.~~D.    "Apple" means Apple Inc., a corporation organized and existing under the laws of the State of California, headquartered in Cupertino, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

~~F.~~E.    "Choice Screen" means a ~~selection menu for either a~~ Search Access Point Choice Screen or ~~a GSE default on a~~ Search ~~Access Point, which Plaintiffs approve~~Default Choice Screen as defined in Section IX.

~~G.~~F.    "Chrome" means all code, software, applications, APIs, and other products and services included in Google's Chromium or the Chrome browser, including the open-source

application framework, libraries, runtime, and kernel which are published at

http://www.chromium.org (or successor sites), and all code, software, applications, APIs, and

other products and services provided by Google that are critical, ~~in~~as informed by the

~~determination~~views of the Technical Committee, to the full and proper functioning of Chromium

or the Chrome browser.

 ~~H.~~G. "Competitor" means any provider of, or potential entrant in the provision of, a

General Search Engine (GSE) or of Search Text Ads in the United States.

 ~~I.~~H. "Device" means any smartphone, tablet, laptop, desktop, or other device that

allows a user to access general search functionality.

 ~~J.~~I. "Distributor" is any Person that contracts with Google to display, load, or

otherwise provide access to a Google product.

 J. "GenAI" or "Generative AI" is a type of artificial intelligence that creates new

content including but not limited to text, images, code, classifications, and other media using

machine learning models.

 K. "GenAI Product" means any application, software, service, feature, tool,

functionality, or product that involves or makes use of Generative AI capabilities or models. It

can include GenAI Search Access Points.

 ~~K.~~L. "Google" means Defendant Google LLC, a limited liability company organized

and existing under the laws of the State of Delaware, headquartered in Mountain View,

California, its parent Alphabet Inc., their successors and assigns, subsidiaries, divisions, groups,

affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and

employees.

~~L.~~M.    "Google Browser" means any web browser owned by Google, including Chrome until divested.

~~M.~~N.    "Google Device" means any Device manufactured or refurbished by Google, including Pixel phones and tablets.

~~N.~~O.    "Google Grounding API" means ~~a~~any method ~~for connecting~~, including via API, by which foundation model output ~~to Google Search results through API.~~or a GenAI Product can connect, call, access, retrieve, or display links or information from Google's GSE.

~~O.~~P.    "General Search Engine" or "GSE" means software or a service that produces links to websites and other relevant information in response to a user query or prompt. "General Search Engine" or "GSE" also has the meaning defined and used in the Court's Memorandum Opinion of August 5, 2024, ECF 1032, at 8.

~~P.~~Q.    The terms "include" and "including" should be read as "including but not limited to," and any use of either word is not limited in any way to any examples provided.

R.      "On-device AI" is a type of artificial intelligence (AI) model that runs on a Device instead of on a cloud server. On-device AI includes a large language model (LLM) or universal language model (ULM) stored entirely on a Device.

~~Q.~~S.    "Person" or "person" means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust.

~~R.~~T.    "Publisher" means any Person who controls the legal right to any information published or otherwise made available on any website or through any mobile app.

~~S.~~U.    "Qualified Competitor" means a Competitor who meets the Plaintiffs' approved data security standards ~~set~~as recommended by the Technical Committee and agrees to regular data security and privacy audits by the Technical Committee, who makes a sufficient showing to

the Plaintiffs, in consultation with the Technical Committee, of a plan to invest and compete in the GSE and/or Search Text Ads markets, and who does not pose a risk to the national security of the United States.

T.    "Ranking Signals" means variables that affect how all items on a Search Engine Results Page (SERP) are positioned and ranked.

U.V.    "Search Access Point" means any software, application, interface, digital product, or service where a user can enter a query or prompt and, in response to at least some user queries or prompts, receive (or be directed to a place to receive) a response that includes information from a GSE., including links to websites. Search Access Points include OS-level Search Access Points (e.g., widgets), browsers (including Search Access Points within browsers such as browser address bars), and search apps as well as their widgets, and GenAI Products that can retrieve and display information from a GSE, including links to websites.

V.W.    "Search Feature" in Google Search means any content on a SERP that is not an organic link. Search Features include images, featured snippets, hotel units, query expansion features like auto-complete, "did you mean" prompts, spelling corrections, and related searches.

W.X.    "Search Index" means any databases that store and organize information about websites and their content that is crawled from the web, gathered from data feeds, or collected via partnerships, from which Google selects information to provide results to users in response to general search queries.

X.Y.    "Search Text Ad" means a general search text advertisement, which is an ad that resembles an organic link on a SERP. "Search Text Ad" also has the meaning defined and used in the Court's Memorandum Opinion of August 5, 2024, ECF 1032, at 60, and includes Search Text Ads appearing in or in connection with Google AI Overviews.

~~Y.~~Z.    "SERP" or "Search Engine Results Page" means the results provided by a search engine, in response to a user query, including links and other features and content, including from a broad index of the web. "SERP" or "Search Engine Results Page" also has the meaning defined and used in the Court's Memorandum Opinion of August 5, 2024, ECF 1032, at 19.

~~Z.~~AA.  "Technical Committee" or "TC" means the five-person committee of experts appointed by the Court pursuant to ~~Section~~Paragraph X.A.

~~AA.~~BB.      "User-side Data" means all data that can be obtained from users in the United States, directly through a search engine's interaction with the user's Device, including software running on that Device, by automated means. User-side Data includes information Google collects when answering commercial, tail, and local queries. User-side Data may also include ~~data sets~~datasets used to train ~~or~~(at all stages of training including pre-training and filtering, post-training, fine-~~tune~~tuning) Google's ranking and retrieval components, as well as ~~artificial intelligence~~GenAI models used for Google's ~~AI Product~~GenAI Products.

## IV.    PROHIBITION ON FORECLOSING OR OTHERWISE EXCLUDING COMPETITORS THROUGH CONTRACTS WITH THIRD PARTIES THAT MAINTAIN GOOGLE'S MONOPOLIES

The purposes of the ~~following~~ remedies set forth in this Section are to unfetter the monopolized markets from Google's exclusionary practices, pry open the monopolized markets to competition, remove barriers to entry, and ensure there remain no practices likely to result in unlawful monopolization of these markets and related markets in the future by prohibiting contracts that foreclose or otherwise exclude Competitors, including by raising their costs, discouraging their distribution, or depriving them of competitive access to inputs.

A.    Preferential Treatment ~~and~~And Payments To Non-Apple Third Parties Prohibited:
Google must not offer or provide ~~something~~anything of value to ~~a~~any non-Apple third party,

including payments ~~or other commercial terms that create an economic disincentive to compete in or enter the GSE or Search Text Ad market(s),~~, for (1) preferential treatment of a General Search Engine (GSE) or Search Access Point relative to Competitors; (2) making or maintaining any GSE as a default within a new or existing Search Access Point or for undermining, frustrating, interfering with, or in any way discouraging the use of any GSE Competitor; or (3) preinstallation, placement, or default status of any Search Access Point. This prohibition includes payments for Choice Screens (with the limited exception noted in Section IX) and preferential treatment of GSE distribution or inputs that would have the effect of disadvantaging any GSE Competitor.

B.    ~~Apple Search Access Points And Devices: Google must not offer or provide anything of value to Apple—or offer any commercial terms—that in any way creates an economic disincentive for Apple to compete in or enter the GSE or Search Text Ad markets.~~

B.    Preferential Treatment And Payments To Apple Prohibited: Google must not offer or provide anything of value to Apple, including payments, for (1) preferential treatment of a General Search Engine (GSE) or Search Access Point relative to Competitors; (2) making or maintaining any GSE as a default within a new or existing Search Access Point or for undermining, frustrating, interfering with, or in any way discouraging the use of any GSE Competitor; or (3) preinstallation, placement, or default status of any Search Access Point. This prohibition includes payments for Choice Screens and preferential treatment of GSE distribution or inputs that would have the effect of disadvantaging any GSE Competitor.

C.    Exclusionary Agreements ~~with~~With Publishers Prohibited: Google must not enter into a contract or other agreement, or enforce any existing agreement, with any Publisher to license data from any Publisher, website, or content creator, which provides Google exclusivity

or otherwise restricts the Publisher's ability to license or otherwise make available the data to any other GSE or ~~AI~~GenAI Product developer. This includes, for example, any agreement with a "most favored nation" or any similar provision that would require the Publisher to give Google the best terms it makes available to any other buyer or licensee.

        D.    <u>Conditional Access Prohibited</u>: Google must not condition access or terms of access to the Play Store or any other Google product on a distribution agreement for a GSE, Search Access Point, or Choice Screen; or an agreement not to distribute a Competitor's product or service. Google must not bundle, tie, comingle, or otherwise condition, a GSE or Search Access Point with any other Google product, for example, by licensing a <u>Google</u> product to a Distributor and including a GSE or Search Access Point <u>license</u> for free.

        E.    <u>Revenue Share Payments Prohibited</u>: Google must not offer or provide to any Distributor ~~anything of variable value~~<u>any payment</u> that is determined or calculated based on the usage of~~,~~ <u>or</u> revenue generated by—or any similar factor for—any particular GSE <u>or Search Access Point</u> (e.g., Google queries, Google Search Text Ad clicks, Google selections on a Choice Screen). <u>For clarity, Google may make payments that are unrelated to search and are not determined or calculated based on the usage of or revenue generated by—or any similar factor for—any particular GSE or Search Access Point.</u>

        ~~F.    Prohibited Investments: Within thirty (30) days of entry of this Final Judgment, Google must notify Plaintiffs of any investment, holding, or interest in any Competitor, any company that controls a Search Access Point or an AI Product, or in any technologies, such as AI Products, that are potential entrants into the GSE or Search Text Ads markets or reasonably anticipated competitive threats to GSEs. Within six (6) months, Google must divest any such interest and immediately refrain from taking any action that could discourage or disincentivize~~

~~that company from developing products or services that compete with, disrupt, or disintermediate Google's GSE or Search Text Ads.~~

F.    ~~Prohibited~~ Search Ad Syndication Payments: Notwithstanding any other provision, Google may make payments to entities syndicating Search Ads from Google, subject to the provisions of Paragraph VIII.E.

G.    Permitted Payments: Notwithstanding any other provision, Google may make the following payments:

1.    Google may pay a third-party to show ads for Search Access Points in an app store, and for offering a Search Access Point in an app store, provided that:

a)    the app store includes at least three similar non-Google Search Access Points;

b)    the Google Search Access Point does not receive more favorable treatment than any other similar Search Access Point; and

c)    the payment complies with Paragraph IV.E.

2.    Google may offer or provide payment or other valuable consideration to a consumer for utilizing Google Search, e.g., Google may pay a consumer for each search they conduct using Google Search. Google must not offer or provide anything of value, including payments, to a consumer to set Google Search as the default GSE.

~~G.~~H.    Acquisitions And Investments: Google must not, without ~~the prior written consent of~~providing Prior Notification, as defined in Paragraph IV.I, to the United States and the Plaintiff States, acquire any interest in, or part of, any company; enter into a new joint venture,

10

partnership, or collaboration, including any marketing or sales agreement; or expand the scope of

an existing joint venture, partnership, or collaboration, with any company that competes with

Google in the GSE or Search Text Ads markets or any company that controls a Search Access

Point or query-based AIGenAI Product. The decision whether to consent is within the sole

discretion of the United States, after consultation with the Co-Plaintiff States and the Colorado

Plaintiff States. Nothing in this provisionParagraph IV.H prevents any StatePlaintiff from

separately investigating or challenging the legality of an acquisition, joint venture, partnership,

or collaboration under applicable state or federal law.

    I.      Prior Notification:

          1.     Unless a transaction is otherwise subject to the reporting and waiting

period requirements of the Hart-Scott-Rodino Antitrust Improvements Act

of 1976, as amended, 15 U.S.C. § 18a (the "HSR Act"), Google may not,

without first providing notification to the United States and the Plaintiff

States, directly or indirectly acquire (including through an asset swap

agreement) any assets of or any interest, including a financial, security,

loan, equity, or management interest, in any person or entity that competes

with Google in the GSE or Search Text Ads markets or any company that

controls a Search Access Point or Gen AI Product.

          2.     Google must provide the notification required by this Paragraph IV.I in the

same format as, and in accordance with the instructions relating to, the

Notification and Report Form set forth in the Appendix to Part 803 of

Title 16 of the Code of Federal Regulations, as amended. Such notice must

also be made to the Plaintiff States. Notification must be provided at least

thirty (30) calendar days before acquiring any assets or interest, and must include, beyond the information required by the instructions, the names of the principal representatives who negotiated the transaction on behalf of each party and all management or strategic plans discussing the proposed transaction. If, within the thirty (30) calendar days following notification, representatives of the United States (after consultation with the Co-Plaintiff States and the Colorado Plaintiff States' enforcement committee), make a written request for additional information, Google may not consummate the proposed transaction until thirty (30) calendar days after submitting all requested information.

3.    Early termination of the waiting periods set forth in this Paragraph IV.I may be requested and, where appropriate, granted in the same manner as is applicable under the requirements and provisions of the HSR Act and rules promulgated thereunder. This Paragraph IV.I must be broadly construed and any ambiguity or uncertainty regarding whether to file a notice under this Paragraph IV.I must be resolved in favor of filing notice.

H.J.    No Circumvention ~~of~~Of This Section's Purposes: Google may not undertake any action or omission with the purpose or effect of circumventing ~~these provisions~~ or frustrating the purposes of this Section. or any of its provisions. For example, Google may not make payments permitted under Paragraphs IV.A, B, E, or G with the purpose or effect of circumventing or frustrating the purposes of this Section. Complaints regarding non-compliance with this ~~provision will be reviewed in the first instance by~~ Section may be referred to the TC for review in accordance with Paragraph X.C.3 below.

12

## V.    PROHIBITION ON FORECLOSING OR OTHERWISE EXCLUDING GSE AND SEARCH TEXT AD COMPETITORS THROUGH OWNERSHIP OR CONTROL OF RELATED PRODUCTS

The purposes of the ~~following~~ remedies set forth in this Section are to unfetter the monopolized markets from Google's exclusionary practices, pry open the monopolized markets to competition, remove barriers to entry, and ensure there remain no practices likely to result in unlawful monopolization of these markets and related markets in the future by requiring Google to divest its browser Chrome and prohibiting Google from providing its search products preferential access to related products or services that it owns or controls such as its mobile operating system (e.g., Android).

A.    <u>Chrome Divestiture</u>: Google must promptly and fully divest Chrome, along with any assets or services necessary to successfully complete the divestiture, to a buyer approved by the Plaintiffs in their sole discretion, subject to terms that the Court and Plaintiffs approve. The evaluation of any potential buyer shall include the potential buyer's proposed business and investment plans (including those for open-source project Chromium), the United States' evaluation, at its sole discretion, of any potential risks to national security, the potential buyer's plans for sharing and protecting user data included in the acquisition, and any other issues a potential buyer may present. Google may not release any other Google Browser during the term of this Final Judgment absent approval by the Court, but Google may continue to support the existing functionality of non-Chrome Google Browsers that have already been released as of March 7, 2025. Nothing in this Paragraph V.A prevents any Plaintiff from separately investigating or challenging the legality of an acquisition, joint venture, partnership, or collaboration under applicable state or federal law.

B.    ~~Android Divestiture Option: In lieu of adhering to the requirements of this Section~~

~~V with respect to Android, Google may elect to fully divest Android, to a buyer approved by the~~

~~Plaintiffs in their sole discretion, subject to terms that the Court and Plaintiffs approve. If Google~~

~~chooses to retain control of Android but fails to comply with the requirements of this Section V~~

~~as they apply to Android, or if compliance with or enforcement of this Final Judgment proves~~

~~unadministrable or ineffective, then Plaintiffs may petition the Court to order the divestiture of~~

~~Android.~~

C.    ~~Self-Preferencing Prohibited: Except as permitted under Section IX, Google must~~

~~not use any Google-owned or operated asset (including any software, website, Device, service,~~

~~dataset, algorithm, or app) to preference Google's GSE, Search Text Ads, or AI Products;~~

~~undermine, frustrate, interfere with, or in any way lessen the ability of a user to discover a rival~~

~~GSE or of an advertiser to discover or shift its Search Text Ad spending to a rival Search Text~~

~~Ads provider; limit the competitive capabilities of a rival GSE or rival Search Text Ads provider;~~

~~or otherwise impede user discovery of products or services that are competitive threats in the~~

~~GSE or Search Text Ads markets. For example, Google must not use its ownership or control of~~

~~Android or any other product or service to disadvantage Competitors, including prompting a user~~

~~to switch the default GSE or to install or switch a Search Access Point. For the avoidance of~~

~~doubt, Google must not provide itself with preferential access to Android or Google-owned apps~~

~~or data as compared to the access it provides to all other GSEs and AI Products, and must not use~~

~~its ownership and control of Android, or any other Google product or service, to:~~

B.    ~~make any Google GSE, Search Text Ads, or AI~~Self-Preferencing Prohibited:

Google must not use its ownership and control of Android, or any other Google product or

service, to:

1.   make any GSE, Search Access Point, GenAI Product ~~(including on-device AI), or On-Device AI explicitly or implicitly~~ mandatory on Android Devices, for example, by preventing interoperability between Android AICore~~,~~ or ~~the~~a Google Grounding API and Competitor products and services ~~or competitive threats~~ in the GSE or Search Text Ads markets;

2.   reduce, prevent, or otherwise interfere with the distribution of ~~rival~~a Competitors' GSE, Search ~~Text Ads~~Access Point, or ~~AI~~GenAI Products ~~on Android Devices~~;

3.   degrade any aspect of quality, including the features, functionality, or user experience, on ~~rival~~a Competitor's GSE, Search ~~Text Ads~~Access Point, or ~~AI~~GenAI Products ~~on Android Devices~~;

4.   explicitly or implicitly, directly or indirectly, prevent or discourage manufacturers or other Android partners (e.g., carriers) from working with ~~Google's~~Competitors' GSE, Search ~~Text Ads~~Access Point, or ~~AI Product rivals~~GenAI Products;

5.   explicitly or implicitly, directly or indirectly, punish or penalize manufacturers or other Android partners (e.g., carriers) that work with ~~Google's~~Competitors' GSE, Search ~~Text Ads~~Access Point, or ~~AI Product rivals~~GenAI Products; or

6.   otherwise use its ownership and control of Android to explicitly or implicitly, directly or indirectly, force or coerce manufacturers or other Android partners (e.g., carriers) to (i) work with Google's GSE~~, Search Text Ads,~~ or ~~AI~~GenAI Products or (ii) give Google's products and

15

services any better treatment than given ~~Google's rivals'~~Competitors'

products.

~~D.~~C.    Contingent Structural Relief: In the event the remedies in this Final Judgment

prove insufficient to serve their intended purposes of restoring competition or if Google attempts

to or is successful in, circumventing these remedies, then the Court may impose additional

structural relief, including the divestiture of Android. ~~Five~~If, at least five (5) years after entry of

this Final Judgment, if Plaintiffs demonstrate by a preponderance of the evidence that either or

both monopolized markets have not experienced a substantial increase in competition, then

Google shall divest Android unless Google can show by a preponderance of the evidence that its

ownership or control of Android did not significantly contribute to the lack of a substantial

increase in competition.

~~E.~~D.    No Circumvention ~~of~~Of This Section's Purposes: Google may not undertake any

action or omission with the purpose or effect of circumventing ~~these provisions~~or frustrating the

purposes of this Section. or any of its provisions. Complaints regarding non-compliance with this

~~provision will~~Section may be ~~reviewed in the first instance by~~referred to the TC for review in

accordance with Paragraph X.C.3 below.

**VI.    REQUIRED DISCLOSURES OF SCALE-DEPENDENT DATA NECESSARY TO COMPETE WITH GOOGLE**
~~**VI.I.    REQUIRED DISCLOSURES OF SCALE-DEPENDENT DATA NECESSARY TO COMPETE WITH GOOGLE**~~

The purposes of ~~these~~the remedies set forth in this Section are to remove barriers to entry,

pry open the monopolized markets to competition, and deprive Google of the fruits of its

violations by providing Competitors access to scale-dependent data inputs—for both search and

ads—that would otherwise provide Google an ongoing advantage from its exclusionary conduct.

These remedies are intended to make this data available in a way that provides suitable security

16

and privacy safeguards for the data that Google must share. ~~Google is prohibited from using and retaining data to which access cannot be provided to Qualified Competitors on the basis of privacy or security concerns.~~

    ~~A.~~   Google's Search Index:

    ~~B.~~A.   For the term of this Final Judgment, Google ~~must provide,~~ will make available, at marginal cost, ~~ongoing access to its Search Index to~~ to Qualified Competitors ~~such that it is equally available to Qualified Competitors and Google.~~ the following data related to Google's Search Index, in addition to any data made available by Google via the APIs required under Sections VII and VIII:

        ~~1.   Google must make available, through the Search Index, all content from any Google-owned website, property, or other operated platform (e.g., all Google owned or operated properties such as YouTube) which Google uses in its own Search Index.~~

        ~~2.   Google must provide the Search Index with latency and reliability functionally equivalent to how Google is able to access its Seach Index.~~

        1.   for each document in the Google Search Index a unique identifier (DocID) and another notation sufficient to denote all the documents Google considers duplicates of each other;

        2.   a DocID to URL map;

        3.   for each DocID a set of signals, attributes, or metadata associated with each DocID that are derived in any part from User-side Data including but not limited to (A) popularity as measured by user intent and feedback systems including Navboost/Glue, (B) quality measures including authoritativeness, (C) time that the URL was first seen, (D) time that the URL was last crawled, (E) spam score, (F) device-type flag, and (G) any

other specified signal the TC recommends to be treated as significant to

the ranking of search results; and

    4.    databases consisting of information sufficient to recreate Google's

Knowledge Graph, including local information.

This information must be provided for all websites in the full Search Index Google uses for

searches on Google.com or any other of its owned and operated general search products. Google

must make this information available to Qualified Competitors on a periodic basis to be

determined by Plaintiffs in consultation with the TC. For clarity, in each periodic update Google

will provide a full set of DocIDs and associated signals for the entire then-current information in

Google's Search Index. Nothing in this Section VI purports to transfer intellectual property rights

of third parties to index users.

    C.B.    Publisher Opt-Out: Google must provide online Publishers, websites, and content

creators with an easily useable mechanism to selectively opt-out of having the content of their

web pages or domains used in search indexing; or used to train or fine-tune AIany of Google's

GenAI models, or AIGenAI Products; used in retrieval-augmented generation-based tools; or

displayed as AI-generated content on its SERP, and such opt-out must be applicable for (on a

model-by-model basis). Google as well as for users of must enable online Publishers, websites,

and content creators to opt-out of individual GenAI Products on a product-by-product basis

without affecting the Search Index.Publisher, website, or content creator's participation or

inclusion in any other Google must provide for an opt-out specific to itself and each index user

on a user-by-user basis and must transmit all opt-outs to index users in a useable format.product

or feature. Google must offer content creators on Google-owned sites (all Google owned or

operated properties, including YouTube) the same opt-out provided to Publishers, websites, and

content creators. Google must not retaliate against any Publisher, website, or content creator who opts-out pursuant to this ~~provision~~Paragraph VI.B.

C.    User-~~side~~Side Data: For the term of this Final Judgment, Google ~~must provide~~ will make available, at marginal cost, to Qualified Competitors~~, at no cost, with access to~~ the following User-side Data on a non-discriminatory basis while safeguarding personal privacy and security. ~~Any~~, in addition to any data made available by Google via the APIs required under Sections VII and VIII:

1.    User-side Data ~~that Google collects~~used to build, create, or operate the GLUE statistical model(s);

2.    User-side Data used to train, build, or operate the RankEmbed model(s); and ~~uses~~

3.    The User-side Data used as ~~part of~~training data for GenAI Models used in Search or any ~~of its products consistent with~~GenAI Product that can be used to access Search.

Google must make this ~~Final Judgement can presumptively be~~ data available to Qualified Competitors on a periodic basis to be determined by Plaintiffs in consultation with the TC.

D.    User-Side Data Sharing Administration: Before this data specified in Paragraph VI.C is shared with Qualified Competitors~~consistent~~, Google must use ordinary course techniques to remove any Personally Identifiable Information. Google must provide sufficient information for each dataset such that it can be reasonably understood by Qualified Competitors, including but not limited to a description of what the dataset contains, any sampling methodology used to create the dataset, and any anonymization or privacy-enhancing technique that was applied. Google will have up to six (6) months from the date of entry of this Final

19

Judgment to implement the technology and provide any notice necessary to comply with this Section VI, and the six-month time period will start once Plaintiffs, in consultation with ~~personal privacy and~~the TC, determine that the technology, including security~~, as Google is prohibited from using and retaining data to which access cannot be provided to Competitors on the basis of and ~~ privacy ~~or security concerns~~safeguards, is fully functional.

E.    Ads Data: For the term of this Final Judgment, Google must provide Qualified Competitors, at marginal cost, the following Ads Data, in addition to any data made available by Google via the APIs required under Sections VII and VIII: Ads Data used to operate, build or train AdBrain models or other models used in Ads targeting, retrieval, assessing ad relevance, bidding, auctioning (including predicted click-through rates (pCTR)), formatting, or content generation.

~~D.~~F.    Ads Data Sharing Implementation: Before this data specified in Paragraph VI.E. is shared with Qualified Competitors, Google must use ordinary course techniques to remove any Personally Identifiable Information. Google must provide sufficient information for each dataset such it can be reasonably understood, including but not limited to a description of what the dataset contains, any sampling methodology used to create the dataset, and any anonymization or privacy-enhancing technique that was applied. Google will have up to six (6) months from the date of entry of this Final Judgment to implement the technology and provide any notice necessary to comply with this Section VI, and the six-month time period will start once Plaintiffs, in consultation with the TC, determine that the technology, including security and privacy safeguards, is fully functional. ~~Qualified Competitors may elect to receive real-time or daily access to the data via an API, data firehose, or data transfer, or other suitable mechanism that Google makes available to or within its own GSE.~~

E.      Synthetic Queries: Google must permit, at no cost, Qualified Competitors to submit synthetic or simulated queries and Google must provide results in the same format as the results provided in the API required in the Section VII below. The Qualified Competitor will be entitled to log and use (in any way) Google's results, including ads and anything else that would appear on a Google SERP. The maximum number of allowable synthetic queries will be determined by the Plaintiffs in consultation with the TC.

F.      Ads Data: For the term of this Final Judgment, Google must provide Qualified Competitors, at no cost, with access to all Ads Data on a non-discriminatory basis while safeguarding personal privacy and security. Any Ads Data that Google collects and uses as part of any of its products consistent with this Final Judgement can presumptively be shared with Qualified Competitors consistent with personal privacy and security, as Google is prohibited from using and retaining data to which access cannot be provided to Competitors on the basis of privacy or security concerns. Google will have up to six (6) months from the date of entry of this Final Judgment to implement the technology necessary to comply with this Section VI, and the time period will start once Plaintiffs, in consultation with the TC, determine that the technology, including security and privacy safeguards, is fully functional. Qualified Competitors may elect to receive real-time or daily access to the data via an API, data firehose, or other transfer, or other suitable mechanism that Google makes available to or within its own GSE.

G.      No Circumvention of̶Of This Section's Purposes: Google may not undertake any action or omission with the purpose or effect of circumventing these provisions or frustrating the purposes of this Section. or any of its provisions. Complaints regarding non-compliance with this provision willSection may be reviewed in the first instance byreferred to the TC for review in accordance with Paragraph X.C.3 below.

21

VII.    **REQUIRED** ~~TEMPORARY~~ **SYNDICATION OF SEARCH RESULTS** ~~AND ADS~~ **NECESSARY TO BUILD GSE QUALITY AND SCALE OF QUALIFIED COMPETITORS**

The purposes of the ~~following~~ remedies set forth in this Section are to remove barriers to entry, pry open the monopolized markets to competition, and deprive Google of the fruits of its violations by enabling Competitors to quickly erode Google's scale advantages, while also providing incentives for those rivals and entrants to transition to independence. Google may not syndicate its search results ~~or Search Text Advertising~~ except as allowed by ~~this~~ Section VII or otherwise approved by Plaintiffs.

A.    Search Syndication License: Google must take steps sufficient to make available to any Qualified Competitor, at no more than the marginal cost of this syndication service, a syndication license whose term will be ten (10) years from the date the license is signed, and which ~~makes~~will require Google, via real-time API(s), to make the following information and data available in response to each query issued or submitted by a Qualified Competitor:

1.    Data sufficient to understand the layout, display, slotting, and ranking of all ~~non-advertising components of its GSE,~~ items or modules on the SERP, including ~~all~~but not limited to the mainline content and sidebar content and sitelinks and snippets;

2.    Ranked organic search results ~~and all~~obtained from Google database or index, regardless of whether such web content was obtained by crawling the Internet or by other means;

3.    Search ~~Features, Ranking Signals for those~~features that enable query corrections, modification, or expansion like spelling, synonyms, autocomplete, autosuggest, related search, "did you mean," "people also

22

ask," and any other important query rewriting features identified by the TC;

    4.    Local, Maps, Video, Images, and Knowledge Panel search feature content; and

    5.    FastSearch results (fast top organic results ~~and Search Features, and query understanding information such that a licensee is enabled to display a SERP, understand Google's ranking rationale, and~~ ).

The information provided pursuant to this Section must be the same as if the Qualified Competitor's query had been submitted through Google.com. It will be the Qualified Competitor's sole discretion to determine how much information to share with Google ~~modified or refined~~regarding the ~~user's query.~~end-user.

    ~~A.~~B.    Syndication License Obligations: Google must provide the license on a non-discriminatory basis to any Qualified Competitor and may impose no restrictions on use, display, or interoperability with Search Access Points, including of ~~AI~~GenAI Products, provided, however, that Google may take reasonable steps to protect its brand, its reputation, and security. ~~For example, licensees~~Licensees may elect, in their sole discretion, which queries (some or all) for which they will request syndicated results and which syndication components to display or use and may do so in any manner they choose. Google may not place any conditions on how any licensee may use syndicated content under ~~this~~ Paragraph VII.A, nor may Google retain, or use (in any way), syndicated queries or other information it obtains under ~~this~~ Paragraph VII.A for its own products and services. For the avoidance of doubt, this Final Judgment only requires Google to provide syndication for queries that originate in the United States.

23

B.C.    Search Syndication License Terms: The search syndication license must have the following additional features:

    1.    Google will make syndicated content available via an API that provides responses with latency and reliability functionally equivalent to what Google provides for its own SERP.

    2.    Syndication will start with significant access to the data required by Paragraph VII.A above and decline over the course of a 10-year period with an expectation that licensees will become independent of Google over time through investment in their own search capabilities. The scope of allowable syndication will be determined by the Plaintiffs in consultation with the TC.

    3.    Google may not consent to licensees exceeding syndication limits set by Plaintiffs, and licensees must submit to the TC audits of syndication frequency.

C.D.    Contingent Search Text Ads Syndication License: Relief: If, at least five (5) years after entry of this Final Judgment, if Plaintiffs demonstrate by a preponderance of the evidence that either or both monopolized markets have not experienced a substantial increase in competition, then Google must take steps sufficient to make available to any Qualified Competitor, at no more than the marginal cost of this syndication service, a syndication license whose term will be one (1) year from the date the license is signedfor the remainder of this Final Judgment and which makes available all components of its Search Text Ads product, including all types of Search Text Ads (including any assets, extensions, or similar Search Text Ad variations) appearing on Google's SERP or available through Google's AdSense for Search.

Google must make the purchase of ads syndicated under this Section available to advertisers on a nondiscriminatory basis comparable to Google's other Search Text Ads. For each syndicated ad result, Google must provide to the Qualified Competitor all Ads Data related to the result, provide the license on a non-discriminatory basis, and may impose no restrictions on use, display, or interoperability with Search Access Points, including of ~~AI~~GenAI Products, provided, however, that Google may take reasonable steps to protect its brand, its reputation, and security.

The Contingent Search Text Ads Syndication License relief is separate from, and in addition to, the Search Text Ads Syndication remedy provided in Paragraph VIII.E, except that the Contingent Search Text Ads Syndication License must, if implemented, comply with Paragraph VIII.E. ~~For example, licensees may elect, in their sole discretion, which queries (some or all) for which they will request syndicated Search Text Ads and which syndication components to display or use and may do so in any manner they choose. Google may not place any conditions on how any licensee may use syndicated content under this Paragraph VII.B. Google may not retain or use (in any way) syndicated queries or other information it obtains under this Paragraph VII.B for its own products and services. For the avoidance of doubt, Google must only provide syndication for queries that originate in the United States.~~

~~1.~~ Synthetic Queries: Google must permit, at marginal cost, Qualified Competitors to submit synthetic or simulated queries, and Google must provide results in the same format as the results provided in the API required in this Section VII. The Qualified Competitor will be entitled to log and use (in any way) Google's results, including ads and anything else that would appear on a Google SERP. The maximum number of allowable synthetic queries will be determined by the Plaintiffs in consultation with the TC.~~Ads Syndication License Terms: The ads syndication license must have the following additional features:~~

~~a)~~ ~~Google must make syndicated content available via an API that provides responses with latency and reliability functionally equivalent to what Google provides for Search Text Ads displayed on its own SERP.~~

b)      ~~Licensees may not request syndicated ads for more than 25% of the Search Text Ads they serve for queries originating in the United States. Google may not consent to requests exceeding these syndication limits, and licensees must submit to the TC audits of syndication frequency.~~

E.

F.      No Restraints On Use For Other Purposes: Google must permit, and must not limit or otherwise restrain, Qualified Competitors from using the information and services obtained under this Section VII for any purpose related to general search or general search text advertising.

~~D.~~G.    Existing Syndication Agreements: The provisions of this Section VII will have no effect on any existing Google syndication agreements with third parties or on its ability to enter into syndication contracts with third parties other than Qualified Competitors, except that:

1.      Google must permit any entity with an existing syndication agreement who becomes a Qualified Competitor, at the Qualified Competitor's sole discretion, to terminate its existing agreement in favor of the remedies in this Section VII.

2.      Google must comply with Paragraph VII.A for all existing syndication agreements between Google and third-party GSEs by the earlier of two (2) years from the Effective Date or the term of any existing syndication contract.

3.      For any existing or future Google agreements licensing or syndicating any search or search ads products to a Competitor, Google cannot:

a)      Enforce any provisions restricting use, display, or interoperability with Search Access Points, including of ~~AI~~GenAI Products,

provided, however, that Google may take reasonable steps to

protect its brand, its reputation, and security. For example,

licensees may elect, in their sole discretion, which queries (some or

all) for which they will request syndicated results and which

syndication components to display or use and may do so in any

manner they choose.

      b)    Retain or use (in any way) syndicated queries or other information

it obtains from Competitors for its own products and services.

~~E.~~H.    No Circumvention ~~of~~Of This Section's Purposes: Google may not undertake any

action or omission with the purpose or effect of circumventing ~~these provisions~~ or frustrating the

purposes of this Section. or any of its provisions. Complaints regarding non-compliance with this

~~provision will~~Section may be ~~reviewed in the first instance by~~referred to the TC for review in

accordance with Paragraph X.C.3 below.

**VIII.  SEARCH TEXT AD TRANSPARENCY AND REDUCTION OF SWITCHING
COSTS**
~~VIII.I. SEARCH TEXT AD TRANSPARENCY AND REDUCTION OF SWITCHING
COSTS~~

The purposes of the ~~following~~ remedies set forth in this Section are to reduce entry

barriers, afford advertisers better data to inform product choices, and pry open the monopolized

markets to competition, including by providing advertisers with information and options

providing visibility into the performance and cost of their Google Search Text Ads and by

providing the necessary ability to optimize their advertising, including by purchasing Search

Text Ads from Google Competitors.

    A.    Search Query Report: For each Search Text Ad served or clicked, Google must

make available to advertisers at the individual ad level for the preceding 18-month period, data

showing the query, keyword trigger, match type, cost-per-click (CPC), click-through rate (CTR), SERP positioning, ~~lifetime~~long-term value (LTV), conversion data, and any other metric necessary for the advertiser to evaluate its ad performance. This data must be made available through an API that permits advertisers to download raw data in real time, generate reports and summaries, and perform other analytical functions to assess ad spend, ad performance, and in-campaign optimization (including the ability to assess incremental clicks generated by Search Text Ads). This data must also be provided to advertisers through periodic (at least monthly) autogenerated summaries accessible through the Google ads system interface.

B.     Keyword Matching: Google must make available to advertisers a keyword matching option such that, when an advertiser chooses this matching option for a given keyword, the advertiser's ad will be eligible for the ad auction only when a query's content exactly matches with no variation to the keyword selected by the advertiser. This same matching option must also be made available for use with negative keywords.

C.     Access ~~to~~To Data Reports: Google must not limit the ability of advertisers to export in real time (by downloading through an interface or API access) data or information relating to their entire portfolio of ads or advertising campaigns bid on, placed through, or purchased through Google, including data relating to placement or performance (~~i.e., conversion data).~~including conversion and conversion value data). The data made available must include all of the information contained in or used by Google in its Google Analytics, Ads Data Hub, Google Ads Data Manager, BigQuery, or Store sales and visitor measurement products, on the most granular and detailed level.

D.     Search Text Ads Auction Changes: On a monthly basis, Google must provide the TC and Plaintiffs a report outlining all changes made to its Search Text Ads auction in the

preceding month, provide (1) Google's public disclosure of that change or (2) a statement why no public disclosure is necessary, and further identify each change which Google considers material. Plaintiffs have the right to challenge any disclosure they deem inadequate.

E.      Search Text Ads Syndication: Google must take steps sufficient to make available to any Qualified Competitor a Search Ads Syndication License whose term will be ten (10) years from the date the license is signed, providing latency, reliability, and performance functionally equivalent to what Google provides for Search Text Ads on its own SERP, and available to Qualified Competitors on financial terms no worse than those offered to any other user of Google's Search Text Ads syndication products, e.g. AdSense for Search, or any other current or future products offering syndicated Search Text Ads. It will be the Qualified Competitor's sole discretion to determine how much information to share with Google regarding the end-user. Search Text Ads syndication licenses to Qualified Competitors must include all types of Search Text Ads (including any assets, extensions, or similar Search Text Ad variations) appearing on Google's SERP or available through its syndication products. Google must make the purchase of ads syndicated under this Paragraph available to advertisers on a nondiscriminatory basis comparable to, and no more burdensome than, the availability of Google's other Search Text Ads, must include Qualified Competitors in its Search Partner Network, and must also provide advertisers the option to appear on each individual Qualified Competitor's sites on a site-by-site basis (i.e. an advertiser can choose to appear as a syndicated result on a Qualified Competitor's site regardless of whether it opts into the Search Partner Network or chooses to appear on any other site, including Google.com). For each syndicated ad result, Google must provide to the Qualified Competitor all Ads Data related to the ads provided to the Qualified Competitor, including the identity of the advertiser and CPC paid, and conversion data where available,

without restrictions on use of the Ads Data including restrictions on using it to market or solicit advertisers for the Qualified Competitors' own advertising products. For ads syndicated to Qualified Competitors, Google may impose no restrictions on use, display, or interoperability with Search Access Points, including of GenAI Products, provided, however, that Google may take reasonable steps to protect its brand, its reputation, and security. Google may not place any conditions on how any Qualified Competitor may use or display syndicated content under this Paragraph VIII.E, including on scraping, indexing, or crawling the syndicated results. For example, licensees may elect, in their sole discretion, which queries (some or all) for which they will request syndicated Search Text Ads and which syndication components to display or use and may do so in any manner they choose. Qualified Competitors must have the right to set a minimum CPC for ads syndicated under this Paragraph VIII.E to appear on their website. Google may not retain or use (in any way) syndicated queries or other information it obtains under this Paragraph VIII.E for its own products and services. For the avoidance of doubt, Google must only provide syndication for queries that originate in the United States.

E.F.    No Circumvention of-Of This Section's Purposes: Google may not undertake any action or omission with the purpose or effect of circumventing these provisions or frustrating the purposes of this Section. or any of its provisions. Complaints regarding non-compliance with this provision will be reviewed in the first instance bySection may be referred to the TC for review in accordance with Paragraph X.C.3 below.

## IX.    LIMITATIONSCHOICE SCREENS ON DISTRIBUTION AGREEMENTSEXISTING NON-APPLE DEVICES, GOOGLE DEVICES, AND USER NOTIFICATION OF GSE CHOICESGOOGLE BROWSERS

The purposes of the following remedies set forth in this Section are to unfetter the markets from Google's illegal monopolization and deprive it of the fruits of its violations by

informing users, including ~~the many users~~<u>those</u> accustomed to Google's default status on their existing Devices and Google Devices, of ~~their~~<u>the</u> competitive choices for GSEs. ~~These~~<u>The</u> remedies <u>in this Section</u> are further intended to limit Google's ability to enter into or continue its anticompetitive distribution agreements.

      A.    <u>Choice Screens For Google</u> Search Access Points On <u>Existing</u> Non-Apple, Third-Party <u>Devices</u>: ~~Google must not offer or provide anything of value to any Distributor for any form of default, placement, or preinstallation distribution (including Choice Screens) related to a GSE or Search Access Point on a non-Apple, third-party Device. Google must not take any action that would undermine, frustrate, interfere with, or in any way reduce the ability of the Device or any third-party or preinstalled Search Access Point to be configured to default to or otherwise interoperate with non-Google GSEs or other competitive entrants.~~ For every Google Search Access Point that was preinstalled <u>on a non-Apple, third-party Device</u> under a distribution agreement before the date of entry of this Final Judgment, Google must offer the Distributor the option to display <u>(1) a</u> <u>Search Access Point</u> Choice Screen <u>(if the Search Access Point Choice Screen includes a Google Browser as an option and the Google Browser is selected, then a Default Search Engine Choice Screen must be shown for the Google Browser) or (2) a Search Default Choice Screen (if Google has already shown a Search Default Choice Screen for another Search Access Point on that Device, Google may apply the previous selection to each Search Access Point),</u> to any user who has Google as their default GSE on that Search Access Point~~, and for~~<u>. For</u> each Device displaying such Choice ~~Screen,~~<u>Screens, the Distributor shall</u> receive from Google ~~a fixed monthly payment~~ for the remaining life of the Device or one (1) year, whichever is shorter, <u>a fixed monthly payment</u> equal to the average monthly amount that Google paid to the Distributor for that Device during the shorter of the 12-month period prior to

the date of entry of this Final Judgment or the lifetime of the Device. ~~For purposes of this Paragraph, Chrome is a Google Search Access Point until it is divested.~~

B.    ~~Default GSEs On Non-Apple, Third-Party Search Access Points: Google must not offer or provide anything of value to any Distributor for any form of default, placement, or preinstallation distribution (including choice screens) related to making any GSE a default within a new or existing Search Access Point.~~

~~C.~~B.    Choice Screens For Search Access Points On Google Devices: ~~Google must not~~On new Google Devices, Google may display a Search Access Point Choice Screen or may preinstall ~~any~~a Google Search Access Point ~~on any new Google Device. Google must not take any action that would undermine, frustrate, interfere with, or in any way reduce~~that implements a Default Search Choice Screen (if the ~~ability of the Device or any third-party or preinstalled~~ Search Access Point ~~to be configured to default to or otherwise interoperate with non-Google GSEs or other competitive entrants. On new Google Devices, Google may display Choice Screens with Search Access Points of~~Choice Screen includes a Google Browser as an option and the Google Browser is selected, then a Default Search Engine Choice Screen must be shown for the ~~same type as options. If the user selects the Google Search Access Point from the Choice Screen, a second Choice Screen must be displayed to determine the default GSE for that Google Search Access Point.~~Google Browser). For each Search Access Point preinstalled on an existing Google Device before the date of entry of this Final Judgment, Google must (a) implement~~,~~ ~~through a software update or otherwise, a Choice Screen~~ a Default Search Choice Screen or a Search Access Point Choice Screen (if the Search Access Point Choice Screen includes a Google Browser as an option and the Google Browser is selected, then a Default Search Engine Choice Screen must be shown for the Google Browser) or (b) ~~cease providing responses from Google's~~

~~GSE to queries from that~~delete—or, if undeletable, remove the visual representation of—the Search Access Point. ~~For purposes of this Paragraph, Chrome is a Google Search Access Point until it is divested.~~

~~D.~~C.    Choice Screens On Google Browsers: Google must display a Search Default Choice Screen on every new and existing instance of a Google Browser where the user has not previously affirmatively selected a default GSE for that Google Browser, including by changing the search default through the settings.

~~E.~~D.    Choice ~~Screen Review By Plaintiffs And The TC~~Screens: Google must disclose each Choice Screen, the related distribution agreement, if relevant, and its plan for implementing that Choice Screen to Plaintiffs and the TC at least sixty (60) days in advance of the Choice Screen being displayed to any user. ~~Each Choice Screen must provide users with a clear choice between competing products and be designed to not preference Google, to be accessible, to be easy to use, and to minimize choice friction, based on empirical evidence of user behavior.~~ After consultation with a behavioral scientist, the TC will report to Plaintiffs whether each Choice Screen satisfies these requirements, and ultimately Plaintiffs must approve any Choice Screen offered pursuant to this Final Judgment. Plaintiffs, in consultation with the TC, may require modifications to any Choice Screen over time. Any choice screen provided for in this Final Judgment must be designed to not preference Google, to be accessible, to be easy to use, and to minimize choice friction, based on empirical evidence of user behavior.

                1.    "Search Access Point Choice Screen" means a choice screen that appears on a Device and is no more favorable to Google than a choice screen with the following characteristics (e.g., a choice screen may be randomized or

may show a Competitor in the top position every time rather than having the options appear in random order):

a)    for a Google Device, five options qualify to appear on the choice screen: a single Google-owned Search Access Point, the Device's current default Search Access Point (if applicable), and the three-to-four (as applicable) consenting rival Search Access Points of the same type with the highest U.S. market shares;

b)    for a non-Google Device, a single Google-owned Search Access Point and three-to-five rival Search Access Points selected by the Distributor appear as options on the choice screen;

c)    the options appear in random order (1) at the device's first use, including after a factory reset; and (2) if the user has not otherwise seen the choice screen within the previous 90 days, at the device's first use on or after a fixed, yearly date coordinated across all Choice Screens; and

d)    the user can return to the choice screen at any time by selecting a reasonably accessible setting.

2.    "Search Default Choice Screen" means a choice screen that appears on a Search Access Point and is no more favorable to Google than a choice screen with the following characteristics (e.g., a choice screen may be randomized or may show a Competitor in the top position every time rather than having the options appear in random order):

a)      for a Google Search Access Point, five options qualify to appear on

the choice screen: a single Google-owned GSE, the current default

search engine (if applicable), and the three-to-four (as applicable)

consenting rival GSEs with the highest U.S. market shares;

b)      for a non-Google Search Access Point, a single Google-owned

GSE and three-to-five rival GSEs selected by the Search Access

Point company appear as options on the choice screen;

c)      the options appear in random order (1) at the Search Access

Point's first use, including after a factory reset; (2) if the user has

not otherwise seen the choice screen within the previous 90 days,

at the Search Access Point's first use on or after a fixed, yearly

date coordinated across all Choice Screens;

d)      the GSE selected on the choice screen becomes the Search Access

Point's default GSE for those user queries and prompts that result

in the display of web links; and

e)      the user can return to the choice screen at any time by selecting a

reasonably accessible setting.

F.E.    [The following provisions in this Paragraph IX.FE are proposed solely by the

Colorado State PlaintiffsPlaintiff States. Plaintiff United States and its Co-Plaintiff States do not

join in proposing these remedies.] Public Education Fund: Google will fund a nationwide

advertising and education program designed to inform users of the outcome of this litigation and,

the remedies in this Final Judgment relating to GSE choices and disclosures of data. In order to

lower, the barrier to entry created by Google's brand recognition (ECF 1032 at 159–60) and to

increase purpose of the effectiveness of remedies to restore competition and improve consumer choice, and the Choice Screen remedy, that funding may include reasonable, short-term incentive payments to users who voluntarily choose a non-Google default GSE on a Choice Screen.mechanisms available to consumers to exercise choice in the selection of GSEs. The Public Education Fund's creation and expendituresFund will be based on predicted outcomes, retrospective analyses, and testing, whichdesigned to best advance the ability of consumers to make informed choices. The TC shall assess the design and funding level of the Public Education Fund for the approval of the Colorado Plaintiff States will approve after consultation with the Technical Committee.and subsequent review of this Court. In its work, the TC shall assess the role of short-term incentive payments in achieving the goals of the Public Education Fund. Nothing in this program will limit the ability of usersconsumers to change any Search Access Point or a search default on a Search Access Point, at any time as they choose.

       G.F.    No Circumvention ofOf This Section's Purposes: Google may not undertake any action or omission with the purpose or effect of circumventing these provisions or frustrating the purposes of this Section. or any of its provisions. Complaints regarding non-compliance with this provision willSection may be reviewed in the first instance byreferred to the TC for review in accordance with Paragraph X.C.3 below.

## X.    EFFICIENT, EFFECTIVE, AND ADMINISTRABLE MONITORING AND ENFORCEMENT

       The purposes of the following remedies set forth in this Section are to ensure the efficient, effective, and administrable monitoring and enforcement of this decree.

       A.    Technical Committee:

           1.    Within thirty (30) days of entry of this Final Judgment, the Court will appoint, pursuant to the procedures below, a five-person Technical

Committee ("TC") to assist in enforcement of and compliance with this Final Judgment.

2.    The TC members must be experts in some combination of software engineering, information retrieval, artificial intelligence, economics, and behavioral science. No TC member may have a conflict of interest that could prevent them from performing their duties in a fair and unbiased manner. In addition, unless Plaintiffs specifically consent, no TC member:

   a)    may have been employed in any capacity by Google or any Competitor to Google within the six-month period directly predating their appointment to the TC;

   b)    may have been retained as a consulting or testifying expert by any party in this action; or

   c)    may perform any work for Google or any Competitor of Google during the time that they serve on the TC and for one (1) year after ceasing to serve on the TC.

3.    Within seven (7) days of entry of this Final Judgment, Plaintiff United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States, and Google will each select one member of the TC, and a majority of those three members will then select the remaining two members. Plaintiff United States' appointee will serve as chair. The selection and approval process will be as follows:

   a)    As soon as practicable after submission of this Final Judgment to the Court, the Plaintiffs as a group will identify to Google the

individuals they propose to select as their designees to the TC, and Google will identify to Plaintiffs the individual it proposes to select as its designee. No party may object to a selection on any ground other than failure to satisfy the requirements of Paragraph X.A.2 above. Any such objection must be made within ten (10) business days of the receipt of notification of selection.

b)    The Plaintiffs will apply to the Court for appointment of the persons selected pursuant to Paragraph X.A.3.a) above. Any objections to the eligibility of a selected person that the parties have failed to resolve between themselves will be decided by the Court based solely on the requirements stated in Paragraph X.A.2 above.

c)    As soon as practicable after their appointment by the Court, the three members of the TC selected by the Plaintiffs and Google (the "Standing Committee Members") will identify to the Plaintiffs and Google the persons that they in turn propose to select as the remaining members of the TC. The Plaintiffs and Google must not object to these selections on any grounds other than failure to satisfy the requirements of Paragraph X.A.2 above. Any such objection must be made within ten (10) business days of the receipt of notification of the selection and must be served on the other party as well as on the Standing Committee Members.

d)      The Plaintiffs will apply to the Court for appointment of the

persons selected by the Standing Committee Members. If the

Standing Committee Members cannot agree on the fourth or fifth

members of the TC, that member or members will be appointed by

the Court. Any objection by Plaintiffs or Google to the eligibility

of the person selected by the Standing Committee Members which

the parties have failed to resolve among themselves will also be

decided by the Court based solely on the requirements stated in

Paragraph X.A.2 above.

4.      The Standing Committee Members will serve for an initial term of thirty-

six (36) months; the remaining members will serve for an initial term of

thirty (30) months. At the end of a TC member's term, the party that

originally selected them may, in its sole discretion, either request re-

appointment by the Court to additional terms of the same length, or

replace the TC member in the same manner as provided for in

Paragraph X.A.3 above. In the case of the fourth and fifth members of the

TC, those members will be re-appointed or replaced in the manner

provided in Paragraph X.A.3 above.

5.      If Plaintiffs determine that a member of the TC has failed to act diligently

and consistently with the purposes of this Final Judgment, or if a member

of the TC resigns, or for any other reason ceases to serve in their capacity

as a member of the TC, the person or persons that originally selected the

TC member will select a replacement member in the same manner as provided for in Paragraph X.A.3 above.

6.     Promptly after appointment of the TC by the Court, the Plaintiffs will enter into a Technical Committee Services Agreement ("TC Services Agreement") with each TC member that grants the rights, powers, and authorities necessary to permit the TC to perform its duties under this Final Judgment. Google must indemnify each TC member and hold them harmless against any losses, claims, damages, liabilities or expenses arising out of, or in connection with, the performance of the TC's duties, except to the extent that such liabilities, losses, damages, claims, or expenses result from misfeasance, gross negligence, willful or wanton acts, or bad faith by the TC member. The TC Services Agreements must include the following:

a)     The TC members will serve, without bond or other security, at the cost and expense of Google on such terms and conditions as the Plaintiffs approve, including the payment of reasonable fees and expenses.

b)     The TC Services Agreement will provide that each member of the TC must comply with the limitations provided for in Paragraph X.A.2 above.

7.     The TC must have the following powers and duties:

a)     The TC will have the power and authority to monitor Google's compliance with its obligations under this Final Judgement.

40

b)    The TC will have the power to ~~set~~recommend reasonable data security standards applicable to Qualified Competitors, which will be approved by the Plaintiffs.

c)    The TC will have the power to evaluate Choice Screens and recommend to Plaintiffs whether they comply with this Final Judgment.

d)    The TC may, on reasonable notice to Google:

(1)    interview, either informally or on the record, any Google personnel, who may have their individual counsel present; any such interview will be subject to the reasonable convenience of such personnel and without restraint or interference by Google;

(2)    inspect and copy any document in the possession, custody, or control of Google personnel;

(3)    obtain reasonable access to any system or equipment to which Google personnel have access;

(4)    obtain reasonable access to, and inspect, any physical facility, building or other premises to which Google personnel have access; and

(5)    require Google personnel to provide ~~compilations of~~ documents, data and other information, and to submit reports to the TC containing such material, in such form as the TC may reasonably direct.

41

e)    The TC will have access to Google's source code and algorithms, subject to a confidentiality agreement, as approved by the Plaintiffs and to be agreed to by the TC members pursuant to Paragraph X.A.8 below, and by any staff or consultants who may have access to the source code and algorithms. The TC may study, interrogate and interact with the source code and algorithms in order to perform its functions and duties, including the handling of complaints and other inquiries from third parties.

f)    The TC will receive complaints from Google's Compliance Officer (as described in ~~Section~~Paragraph X.B below), third parties, or the Plaintiffs and handle them in the manner specified in ~~Section~~Paragraph X.C below.

g)    The TC must report in writing to the Plaintiffs, initially every three (3) months for three (3) years and thereafter every six (6) months until expiration of this Final Judgment, the actions it has undertaken in performing its duties pursuant to this Final Judgment, including the identification of each business practice reviewed and any recommendations made by the TC.

h)    Regardless of when reports are due, when the TC has reason to believe that there may have been a failure by Google to comply with any term of this Final Judgment, or that Google is attempting to circumvent any provision of this Final Judgment or the ~~goals~~intended purposes of this Final Judgment, the TC must

42

immediately notify the Plaintiffs in writing setting forth the

relevant details.

i)      TC members may communicate with third parties about how their

complaints or inquiries might be resolved with Google, so long as

the confidentiality of information obtained from Google is

maintained.

j)      The TC may hire at the cost and expense of Google, with prior

notice to Google and subject to approval by the Plaintiffs, such

staff or consultants (all of whom must meet the qualifications of

~~Section~~Paragraphs X.A.2.a-c) as are reasonably necessary for the

TC to carry out its duties and responsibilities under this Final

Judgement. The compensation of any person retained by the TC

will be based on reasonable and customary terms commensurate

with the individual's experience and responsibilities.

k)      The TC must account for all reasonable expenses incurred,

including agreed upon fees for the TC members' services, subject

to the approval of the Plaintiffs. Google's failure to promptly pay

the TC's accounted-for costs and expenses, including for agents

and consultants, will constitute a violation of this Final Judgment

and may result in sanctions imposed by the Court. Google may, on

application to the Court, object to the reasonableness of any such

fees or other expenses only if Google has conveyed such

objections to the Plaintiffs and the TC within ten (10) calendar

43

days of receiving the invoice for such fees or other expenses. On

any such application, (a) Google will bear the burden to

demonstrate unreasonableness; (b) Google must establish an

escrow account into which it deposits the disputed costs and

expenses until the dispute is resolved; and (c) the TC members will

be entitled to recover all costs incurred on such application

(including reasonable attorneys' fees and costs), regardless of the

Court's disposition of such application, unless the Court expressly

finds that the TC's opposition to the application was without

substantial justification.

l)    *[The following provision in Paragraph X.A.7.l is proposed solely*

*by the Colorado* ~~State Plaintiffs.~~*Plaintiff States.  Plaintiff United*

*States and its Co-Plaintiff States do not join in proposing this*

*remedy.]* The TC will have the power to implement the Public

Education Fund as provided for in Paragraph IX.~~F~~E above.

8.    Each TC member, and any consultants or staff hired by the TC, must sign

a confidentiality agreement prohibiting disclosure of any information

obtained in the course of performing his or her duties as a member of the

TC or as a person assisting the TC, to anyone other than another TC

member or a consultant or staff hired by the TC, Google, the Plaintiffs, or

the Court. All information gathered by the TC in connection with this

Final Judgment and any report and recommendations prepared by the TC

must be treated as Highly Confidential under the Protective Order in this

case, and must not be disclosed to any person other than another TC member or a consultant or staff hired by the TC, Google, the Plaintiffs, and the Court except as allowed by the Protective Order entered in the Action or by further order of this Court. No member of the TC may make any public statements relating to the TC's activities.

B.    <u>Internal Compliance Officer:</u>

1.    Google must designate, within thirty (30) days of entry of this Final Judgment, an employee of Google as the internal Compliance Officer with responsibility for administering Google's antitrust compliance program and helping to ensure compliance with this Final Judgment.

2.    Within seven (7) days of the Compliance Officer's appointment, Google must identify to the Plaintiffs the Compliance Officer's name, business address, telephone number, and email address. Within fifteen (15) days of a vacancy in the Compliance Officer position, Google must appoint a replacement and identify to the Plaintiffs the replacement Compliance Officer's name, business address, telephone number, and email address. Google's initial or replacement appointment of the Compliance Officer is subject to the approval of the ~~United States, in its sole discretion, after consultation with the Co-Plaintiff States and the Colorado Plaintiff States~~<u>Plaintiffs</u>.

3.    The Compliance Officer must supervise the review of Google activities to ensure that they comply with this Final Judgment. The Compliance Officer may be assisted by other employees of Google.

45

4.    The Compliance Officer must be responsible for performing the following

activities:

a)    within thirty (30) days after entry of this Final Judgment,

distributing a copy of the Final Judgment to all officers and

employees of Google;

b)    distributing a copy of this Final Judgment to any person who

succeeds to a position described in Paragraph X.B.4.a above within

thirty (30) days of the date the person starts that position;

c)    ensuring that those persons designated in Paragraph X.B.4.a above

are annually trained on the meaning and requirements of this Final

Judgment and the U.S. antitrust laws and advising them that

Google's legal advisors are available to confer with them regarding

any question concerning compliance with this Final Judgment or

the U.S. antitrust laws;

d)    obtaining from each person designated in Paragraph X.B.4.a above

an annual written certification that he or she: (i) has read and

agrees to abide by the terms of this Final Judgment; and (ii) has

been advised and understands that his or her failure to comply with

this Final Judgment may result in a finding of contempt of court;

e)    maintaining a record of all persons to whom a copy of this Final

Judgment has been distributed and from whom the certification

described in Paragraph X.B.4.d above has been obtained;

f)      ensuring that all employees, and all new employees, receive a copy of this Final Judgment and receive annual training on compliance with the U.S. antitrust laws (the Compliance Officer will be responsible for approving the content, schedule, and scope of delivery of compliance training within Google with respect to: compliance with the decree itself; ~~substantive~~U.S. antitrust laws; and obligations to preserve and produce materials for use in investigations, litigations, or regulatory proceedings);

g)      annually communicating to all employees that they may disclose to the Compliance Officer, without reprisal for such disclosure, information concerning any violation or potential violation of this Final Judgment or the U.S. antitrust laws by Google, and establishing a confidential avenue for any employee to report potential violations;

h)      establishing and maintaining the website provided for in Paragraph X.C.2.a below;

i)      receiving complaints from third parties, the TC, and the Plaintiffs concerning Google's compliance with this Final Judgment and following the appropriate procedures set forth in ~~Section~~Paragraph X.C below;

j)      maintaining a record of all complaints received and action taken by Google with respect to each such complaint; and

    k)    ensuring employees retain all relevant documents and electronically stored information, regardless of medium or form, related to this Final Judgement and all complaints received and or action taken by Google with respect to any complaint.

5.    Google must withing thirty (30) days further appoint a senior business executive, who has visibility into any Google entity with obligations under this Final Judgment, who Google will make available to update the Court on Google's compliance at regular status conferences or as otherwise ordered.

6.    Google will retain (if it has not already) a licensed attorney in good standing in California to collect documents and interview employees and generally review Google's document retention practices and Google's compliance with its legal discovery obligations under this case and final judgment. This attorney will be retained for a term no shorter than eighteen (18) months. This attorney (and any team this attorney assembles) will present to the Audit and Compliance Committee (or any successor Board Committee) on the retention of documents and Google's compliance with its discovery obligations.

C.    <u>Voluntary Dispute Resolution</u>:

1.    Third parties may submit complaints concerning Google's compliance with this Final Judgment to the Plaintiffs, the TC, or the Compliance Officer.

2.      Third parties, the TC, or Plaintiffs in their discretion may submit to the

Compliance Officer any complaints concerning Google's compliance with

this Final Judgment. Without in any way limiting their authority to take

any other action to enforce this Final Judgment, the Plaintiffs may submit

complaints to the Compliance Officer whenever doing so would be

consistent with the public interest.

a)      To facilitate the communication of complaints and inquiries by

parties, the Compliance Officer must place on Google's website, in

a manner acceptable to the Plaintiffs, the procedures for submitting

complaints. To encourage whenever possible the informal

resolution of complaints and inquiries, the website must provide a

mechanism for communicating complaints and inquiries to the

Compliance Officer.

b)      Google has thirty (30) days after receiving a complaint to attempt

to resolve or to reject it.

c)      Within thirty (30) days of receiving a complaint, the Compliance

Officer must advise the TC ~~of~~and the Plaintiffs of the nature of the

complaint and its disposition. The TC may then ~~take~~propose to the

Plaintiffs further actions consistent with this Final Judgment,

including consulting with Plaintiffs regarding the complaint.

3.      The Compliance Officer, third parties, or the Plaintiffs in their discretion

may submit to the TC any complaints concerning Google's compliance

with this Final Judgment.

49

a)    The TC must investigate complaints it receives and will consult with the Plaintiffs regarding its investigation. At least once during its investigation, and more often when it may help resolve complaints informally, the TC will meet with the Compliance Officer to allow Google to respond to the substance of the complaint and to determine whether the complaint can be resolved without further proceedings.

b)    ~~If the TC concludes that a complaint is meritorious, it~~Following its investigation, the TC will advise Google and the Plaintiffs of its conclusion and its proposal for cure.

c)    Reports and recommendations from the TC may be received into evidence by the Court in connection with any effort by any Plaintiff to enforce this Final Judgment but must not be otherwise made available in any other court or tribunal related to any other matter. No member of the TC will be required to testify by deposition, in court, or before any other tribunal regarding any matter related to this Final Judgment.

d)    The TC may preserve the anonymity of any third-party complainant where it deems it appropriate to do so upon the request of the Plaintiffs or the third party, or in its discretion.

D.    <u>Compliance Inspection</u>:

1.    Without in any way limiting the sovereign enforcement authority of each of the Colorado Plaintiff States, the Colorado Plaintiff States will form a

committee to coordinate their enforcement of this Final Judgment. Neither a Co-Plaintiff State nor a Colorado Plaintiff State may take any action to enforce this Final Judgment without first consulting with the United States and with the Colorado Plaintiff States' enforcement committee.

2. For the purposes of determining or securing compliance with this Final Judgment or of determining whether this Final Judgment should be modified or vacated, upon written request of an authorized representative of the Assistant Attorney General for the Antitrust Division (after consultation with the Co-Plaintiff States and the Colorado Plaintiff States' enforcement committee) or of the Attorney General of a Co-Plaintiff State or the Attorney General of a Colorado Plaintiff State (after consultation with the United States and the Colorado Plaintiff States' enforcement committee), as the case may be, and reasonable notice to Google, Google must permit, from time to time and subject to legally recognized privileges, authorized representatives, including agents retained by any Plaintiff:

a) to have access during Google's office hours to inspect and copy, or at the option of the Plaintiff, to require Google to provide electronic copies of all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Google relating to any matters contained in this Final Judgment; and

b) to interview, either informally or on the record, Google's officers, employees, or agents, who may have their individual counsel

present, relating to any matters contained in this Final Judgment. The interviews must be subject to the reasonable convenience of the interviewee and without restraint or interference by Google.

3.    Upon the written request of an authorized representative of the Assistant Attorney General for the Antitrust Division (after consultation with the Co-Plaintiff States and the Colorado Plaintiff States' enforcement committee) or of the Attorney General of a Co-Plaintiff State or the Attorney General of a Colorado Plaintiff State (after consultation with the United States and the Plaintiff States' enforcement committee), Google must submit written reports or respond to written interrogatories, under oath if requested, relating to any matters contained in this Final Judgment.

E.    <u>Anti-Retaliation</u>: Google must not retaliate in any form against a person because it is known to Google that the person is or is contemplating:

1.    developing, distributing, promoting, syndicating, using, selling, offering, or licensing any product or service that competes with—or facilitates competition with—a Google-affiliated GSE or a Google-affiliated Search Text Ads product;

2.    filing a complaint related to Google's compliance with this Final Judgment;

3.    testifying, assisting, cooperating with, or participating in any manner in an investigation, proceeding, hearing, or litigation related to Google's compliance with this Final Judgment; or

4.       exercising any of the options or alternatives provided for under this Final

Judgment.

F.       <u>Anti-Circumvention</u>: Google is enjoined from enforcing or complying with any

provision in any existing or future contract, agreement, or understanding which is otherwise

prohibited by this Final Judgment.

1.       Google must not (i) engage in any conduct designed to replicate the effect

of any behavior found by the Court to violate the Sherman Act; (ii) engage

in any conduct substantially similar to conduct prohibited by another

Section of this Final Judgment or designed to evade any obligation

imposed by this Final Judgment; or (iii) engage in any conduct with the

purpose or effect of evading or frustrating the <u>intended</u> purposes of ~~this~~

~~Final Judgment, as stated throughout~~ this Final Judgment.

1.       ~~If Google is found liable in any federal court for a violation of the antitrust~~
~~laws involving GSE or Search Text Ads, the Court may, upon judicial~~
~~notice of the liability finding, automatically order the structural relief~~
~~provided for in Paragraph V.D above.~~

2.       For the avoidance of doubt, the provisions in this ~~Section~~<u>Paragraph</u> X.F

are worldwide in scope and are applicable to Google's conduct or

contracts regardless of where it occurred or purports to apply.

G.       <u>No Circumvention ~~of~~<u>Of</u> This Section's Purposes</u>: Google may not undertake any

action or omission with the purpose or effect of circumventing ~~these provisions~~ or frustrating the

purposes of this Section~~.~~ <u>or any of its provisions.</u> Complaints regarding non-compliance with this

~~provision will~~<u>Section may</u> be ~~reviewed in the first instance by~~<u>referred to</u> the TC <u>for review</u> in

accordance with Paragraph X.C.3 ~~above~~<u>below</u>.

## XI.    RETENTION OF JURISDICTION AND ENFORCEMENT OF FINAL JUDGMENT

A.    Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders or directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any of ~~the~~its provisions ~~hereof~~ (including an order ~~divesting~~to divest any relevant Google business), for the enforcement of compliance ~~herewith~~with this Final Judgment, and for the punishment of any violation ~~hereof~~of this Final Judgment. In any motion to modify this Final Judgment, Plaintiffs need not show any change in circumstances, but need only demonstrate that modification is necessary to achieve the ~~ultimate goals~~intended purposes of this Final Judgment to restore competition in the monopolized markets. In any action to enforce this Final Judgment, Google must show by a preponderance of the evidence that its actions are in compliance with this Final Judgment.

B.    The Court may act *sua sponte* to issue orders or directions for the construction or carrying out of this Final Judgment, for the enforcement of compliance ~~therewith~~, and for the punishment of any violation ~~thereof~~.

C.    This Final Judgment should be interpreted to give full effect to the procompetitive purposes of the U.S. antitrust laws and to restore the competition the Court found was harmed by Google's illegal conduct.

D.    For a period of four (4) years following the expiration of this Final Judgment, if any Plaintiff has evidence that Google violated this Final Judgment before it expired, that Plaintiff may file an action against Google in this Court requesting that the Court order (1) Google to comply with the terms of this Final Judgment for an additional term of at least four

(4) years following the filing of the enforcement action; (2) all appropriate contempt remedies; and (3) additional relief needed to ensure Google complies with the terms of this Final Judgment.

     E.     In connection with a successful effort by any Plaintiff to enforce this Final Judgment against Google, whether litigated or resolved before litigation, Plaintiff may request that the Court order Google to reimburse that Plaintiff for the fees and expenses of its attorneys, as well as all other costs, including experts' fees, incurred in connection with that effort to enforce this Final Judgment, including in the investigation of the potential violation.

## XII.   EFFECTIVE DATE AND EXPIRATION OF FINAL JUDGMENT

     This Final Judgment will take effect thirty (30) days after the date on which it is entered, (the "Effective Date"), and Plaintiffs must report the date on which Google has substantially implemented all provisions of this Final Judgment (the "Effective Date"). Unless the Court grants an extension or early termination is granted, this Final Judgment will expire ten (10) years from the Effective Date. This Final Judgment may be terminated upon notice by the United States (after consultation with the Co-Plaintiff States), the Colorado Plaintiff States' enforcement committee, and Google that continuation of this Final Judgment is no longer necessary to restore competition in the monopolized markets. Alternatively, if Google has substantially complied with all terms of this Final Judgment for at least the preceding five (5) years and if Google's Competitors' combined market share in U.S. GSEs, as measured by the six-month moving medians of two industry standards, agreed upon by Google and the Plaintiffs, is greater than 50% (excluding all syndicated queries), Google may petition the Court to terminate this Final Judgment on the grounds that competition in both relevant markets has increased so substantially that this Final Judgment is no longer needed.

## XIII.  THIRD-PARTY RIGHTS

Nothing in this Final Judgment is intended to confer upon any other persons any rights or remedies of any nature whatsoever ~~hereunder~~ or by reason of this Final Judgment other than the right to submit complaints to the Compliance Officer and the TC.

## XIV.  FEES **AND COSTS**

Plaintiffs are prevailing parties in this litigation. Google is ordered to pay Plaintiff United States' ~~reasonable attorneys' fees and~~ costs, the Co-Plaintiff States' reasonable attorneys' fees and costs, and the Colorado Plaintiff States' reasonable attorneys' fees and costs.


Date: _____


_____
Judge Amit Mehta
United States District Judge

Attachment C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | |
| Defendant. | |

| | |
|---|---|
| State of Colorado, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| Google LLC, | |
| Defendant. | |

## **DEFENDANT GOOGLE LLC'S PROPOSED FINAL JUDGMENT**

WHEREAS, Plaintiffs United States of America, and the States and Commonwealths of Arkansas, California, Georgia, Florida, Indiana, Kentucky, Louisiana, Michigan, Missouri, Mississippi, Montana, South Carolina, Texas, and Wisconsin, by and through their respective Attorneys General, filed their Complaint on October 20, 2020, and their Amended Complaint on January 15, 2021;

AND WHEREAS, Plaintiffs Colorado, Nebraska, Arizona, Iowa, New York, North Carolina, Tennessee, Utah, Alaska, Connecticut, Delaware, District of Columbia, Guam, Hawaii, Idaho, Illinois, Kansas, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire,

New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Dakota, Vermont, Virginia, Washington, West Virginia, and Wyoming filed their Complaint on December 17, 2020;

AND WHEREAS, the Court conducted a trial and entered Findings of Fact and Conclusions of Law in both actions on August 5, 2024 accepting certain claims and rejecting certain claims of Plaintiffs;

NOW THEREFORE, upon the record at trial and all prior and subsequent proceedings, it is hereby ORDERED, ADJUDGED, AND DECREED:

## I.    JURISDICTION

This Court has jurisdiction over the subject matter of this action and over Google LLC ("Google").

## II.    APPLICABILITY

This Final Judgment applies to Google and to each of its officers, directors, agents, employees, subsidiaries, successors, and assigns.

## III.    PROHIBITED CONDUCT

A.    Google shall not enter into any agreement with a mobile device manufacturer that conditions the licensing of Google Play or any other Google software application on that mobile device manufacturer also distributing, preloading, placing, displaying, using, or licensing the Google Search Application on mobile phones and tablets sold in the United States.

B.    Google shall not enter into any agreement with a mobile device manufacturer that conditions the licensing of Google Play or any other Google software application on that mobile device manufacturer also distributing, preloading, placing, displaying, using, or licensing the Chrome Browser Application on mobile phones and tablets sold in the United States.

C.      Google shall not enter into any agreement with a mobile device manufacturer that conditions the licensing of the Google Search Application, the Chrome Browser Application, or Google Play, on the mobile device manufacturer also distributing, preloading, placing, displaying, using, or licensing the Google Assistant Application on mobile phones and tablets sold in the United States.

D.      Google shall not enter into any agreement with a mobile device manufacturer that conditions the licensing of the Google Search Application, the Chrome Browser Application, or Google Play, on the mobile device manufacturer also distributing, preloading, placing, displaying, using, or licensing the Gemini Assistant Application on mobile phones and tablets sold in the United States.

E.      Google shall not enter into any agreement with a mobile device manufacturer or wireless carrier that conditions (i) Consideration or (ii) the license of Google Play or any Google software application, on that mobile device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party General Search Service on mobile phones and tablets sold in the United States.

F.      Google shall not enter into any agreement with a mobile device manufacturer or wireless carrier that conditions (i) Consideration or (ii) the license of Google Play or any Google software application, on that mobile device manufacturer or wireless carrier refraining from developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party Browser on mobile phones and tablets sold in the United States.

G.      Google shall not enter into any agreement with a mobile device manufacturer or wireless carrier that conditions (i) Consideration or (ii) the license of Google Play or any Google software application, on that mobile device manufacturer or wireless carrier refraining from

developing, distributing, preloading, placing, displaying, using, selling, or licensing any Third-Party Generative AI Assistive Service on mobile phones and tablets sold in the United States.

H.      Google shall not enter any agreement with a mobile device manufacturer or wireless carrier that conditions the payment for preload, placement, or assignment of an access point for the Google Search Application on the preload, placement, or assignment of any other access point to any of Google Search, the Chrome Browser Application, the Google Assistant Application, and/or the Gemini Assistant Application on mobile phones and tablets sold in the United States.

I.       Google shall not enter any agreement with a mobile device manufacturer or wireless carrier that conditions the payment for preload, placement, or assignment of an access point for the Chrome Browser Application on the preload, placement, or assignment of any other access point to any of the Google Search Application, the Google Assistant Application, and/or the Gemini Assistant Application on mobile phones and tablets sold in the United States.

J.       Google shall not enter any agreement with a mobile device manufacturer or wireless carrier that conditions the payment for preload, placement, or assignment of an access point for the Google Assistant Application or the Gemini Assistant Application on the preload, placement, or assignment of any other access point to any of the Google Search Application and/or the Chrome Browser Application on mobile phones and tablets sold in the United States.

K.      Google shall not enter into any agreement requiring a Browser Developer to set Google Search as the Browser Default Search Engine in a Third-Party Browser in the United States unless the agreement (i) permits the Browser Developer on an annual basis to set a different Default Search Engine in the United States for any Operating System Version and/or Privacy Mode offered by the Browser Developer without foregoing any payments attributable to

4

an Operating System Version or Privacy Mode where Google Search remains set as the Default

Search Engine; and (ii) expressly permits the Browser Developer to promote any Third-Party

General Search Service.

L.    Google shall not enter any agreement requiring Apple Inc. ("Apple") to set

Google Search as the Default Search Engine in the United States with respect to any proprietary

Apple feature or functionality, including Siri and Spotlight, unless the agreement complies with

Section K above.

M.    Nothing in this Final Judgment shall otherwise prohibit Google from providing

Consideration to a mobile device manufacturer or wireless carrier with respect to any Google

product or service in exchange for such entity's distribution, placement on any access point,

promotion, or licensing of that Google product or service.

N.    Nothing in this Final Judgment shall prohibit Google from distributing the Google

Search Application, the Google Assistant Application, and the Gemini Assistant Application

through a single Application Programming Kit (APK) as long as the licensee has the option to

disable end-user access to any of those applications and services that the licensee declines to

license.

## IV.    COMPLIANCE AND ENFORCEMENT PROCEDURES

### A.    Annual Compliance Report and Compliance Inspection

1.    Without limiting the sovereign enforcement authority of each of the Plaintiff

States, the Plaintiff States will form a committee to coordinate their enforcement of this Final

Judgment ("Plaintiff States' Committee").  No Plaintiff State shall take any action to enforce this

Final Judgment without first consulting with the United States and with the Plaintiff States'

Committee.

2.    Google will prepare and submit, on an annual basis, a written report describing its compliance with this Final Judgment ("Annual Compliance Report").

3.    To determine and enforce compliance with this Final Judgment, upon written request and on reasonable notice to Google and subject to any lawful privilege, a duly authorized representative of the United States (after consultation with the Plaintiff States' Committee) or of the Attorney General of a Plaintiff State (after consultation with the United States and the Plaintiff States' Committee), may:

a.    Request from Google no more than one interim written report per year ("Interim Report"), under oath if requested, regarding Google's compliance with Part III of this Final Judgment.

b.    Make reasonable requests to Google for production of non-privileged documents and records in its possession, custody, or control sufficient to verify the matters contained in Google's Annual Compliance Report or Interim Report; and

c.    Subject to the reasonable convenience of Google and without restraint or interference from it, interview officers, employees, or agents of Google, who may have counsel present, sufficient to verify the matters contained in Google's Annual Compliance Report or Interim Report.

4.    No information or documents obtained by the means provided in this section shall be divulged by the United States or the Plaintiff States to any person, except in the course of legal proceedings to which the United States is a party, or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

5.    If, at the time information or documents are furnished by Google to the United States or the Plaintiff States, Google identifies in writing the material in any such information or

documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Google marks each pertinent page of such material, "Confidential and Sensitive Commercial Information Subject to Rule 26(c)(1)(G)" then the United States shall give 10 business days' notice prior to divulging such material in any legal proceeding.

6.      Google shall have the right to claim protection from public disclosure, under the Freedom of Information Act, 5 U.S.C. § 552, or any other applicable law or regulation, for any material it submits to the United States or the Plaintiff States under this Final Judgment.  After appropriate consideration of such claim of protection, the United States or the Plaintiff States, as the case may be, will either assert that the material is protected from disclosure under law or give Google 10 business days' notice of its intent to disclose the material.

### B.      Internal Compliance Officer

1.      Google shall designate, within 30 days of entry of this Final Judgment, an internal Compliance Officer who shall be an employee of Google with responsibility for administering Google's antitrust compliance program and helping to ensure compliance with this Final Judgment.

2.      The Compliance Officer shall supervise the review of Google's activities to ensure that they comply with this Final Judgment. The Compliance Officer may be assisted by other employees of Google.

3.      The Compliance Officer shall be responsible for performing the following activities:

a.      within 45 days after entry of this Final Judgment, distributing a copy of this Final Judgment to all officers and directors of Google;

b.     promptly distributing a copy of this Final Judgment to any person who succeeds to a position described in Paragraph IV.B.3.a;

c.     ensuring that those persons designated in Paragraph IV.B.3.a are annually briefed on the meaning and requirements of this Final Judgment and the U.S. antitrust laws and advising them that Google's legal advisors are available to confer with them regarding any question concerning compliance with this Final Judgment or U.S. antitrust law;

d.     obtaining from each person designated in Paragraph IV.B.3.a an annual written certification that he or she: (i) has read and agrees to abide by the terms of this Final Judgment; and (ii) has been advised and understands that his or her failure to comply with this Final Judgment may result in a finding of contempt of court;

e.     maintaining a record of all persons to whom a copy of this Final Judgment has been distributed and from whom the certification described in Paragraph IV.B.3.d has been obtained;

f.     establishing and maintaining the website provided for in Paragraph IV.C.2.b;

g.     preparing the Annual Compliance Report described in Paragraph IV.A.2 and any Interim Report requested as described in Paragraph IV.A.3.a.

h.     receiving complaints from third parties or the Plaintiffs concerning Google's compliance with this Final Judgment and following the appropriate procedures set forth in Section IV.C;

i.     maintaining a record of all complaints received and action taken by Google with respect to each such complaint; and

j.      ensuring employees retain all relevant documents and electronically stored information, regardless of medium or form, regarding all complaints received pursuant to Paragraph IV.C.1 and action taken by Google with respect to any such complaint.

**C.     Voluntary Dispute Resolution**

1.      Third parties may submit complaints concerning Google's compliance with this Final Judgment to the Plaintiffs or the Compliance Officer.

2.      Submissions to the Compliance Officer.

a.      Third parties or Plaintiffs in their discretion may submit to the Compliance Officer any complaints concerning Google's compliance with this Final Judgment. Without in any way limiting their authority to take any other action to enforce this Final Judgment, the Plaintiffs may submit complaints related to Google's compliance with Section III to the Compliance Officer whenever doing so would be consistent with the public interest.

b.      To facilitate the communication of complaints and inquiries by parties, the Compliance Officer shall place on Google's corporate website, in a manner reasonably acceptable to the Plaintiffs, the procedures for submitting complaints. To encourage whenever possible the informal resolution of complaints and inquiries, the website must provide a mechanism for communicating complaints and inquiries to the Compliance Officer.

c.      Google shall have 30 days after receiving a complaint to attempt to resolve or to reject it.

**V.     EFFECTIVE DATE; TERMINATION**

A.      Subject to the outcome of any motion to stay this Final Judgment pending appeal, this Final Judgment shall take effect 120 days after the date on which it is entered.

B.      Pursuant to Local Rule 54.2, the deadline for any motion under Federal Rule of Civil Procedure 54(d)(2)(B) and the proceedings as to any such motion shall be held in abeyance pending the conclusion of any appeals from this Final Judgment.

C.      Unless this Court grants an extension, this Final Judgment will expire on the third anniversary of the date on which it takes effect.

## VI.    DEFINITIONS

A.      "Browser Developer" means a developer, owner, or operator of a Third-Party Browser and includes, by way of example, Apple, Mozilla Corp., and Samsung Electronics Co., Ltd.

B.      "Chrome Browser Application" means the mobile browser software application currently marketed by Google as "Google Chrome" and its successors.

C.      "Consideration" means any monetary payment; provision of preferential licensing terms; technical, marketing, and sales support; developer support; or hardware or software certification or approval.

D.      "Default Search Engine" means a search engine that is set by a Browser Developer to respond to user queries if a user takes no action to select a particular search engine.

E.      "Gemini Assistant Application" means the stand-alone user-facing mobile software application currently marketed by Google as the "Google Gemini" application (and that application's functionally equivalent successors) that is a generative artificial intelligence chatbot that has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information.

F.      "Google Assistant Application" means the user-facing mobile assistive service software application marketed by Google as "Google Assistant" and its successors.

G.      "Google Play" means the user-facing mobile software application distribution service currently marketed by Google as the "Play Store" and its successors.

H.      "Google Search" means the web search and search advertising services offered by Google at Google.com.

I.      "Google Search Application" means the user-facing mobile online search software application currently marketed by Google as the "Google app" or the "Google Search app" (and its successors).

J.      "Operating System Version" means a web browser version designed to be installed and used on a particular desktop or mobile operating system including, by way of example, Microsoft Windows, Apple iOS, Apple Mac OS, Apple iPad OS, or Android.

K.      "Plaintiff States" means the States and Commonwealths of Arkansas, California, Georgia, Florida, Indiana, Kentucky, Louisiana, Michigan, Missouri, Mississippi, Montana, South Carolina, Texas, and Wisconsin, Colorado, Nebraska, Arizona, Iowa, New York, North Carolina, Tennessee, Utah, Alaska, Connecticut, Delaware, District of Columbia, Guam, Hawaii, Idaho, Illinois, Kansas, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Dakota, Vermont, Virginia, Washington, West Virginia, and Wyoming.

L.      "Privacy Mode" means a mode within a web browser that is designed to offer a preconfigured privacy setting and includes, by way of example, Private Browsing in Apple Safari, Private mode in Mozilla Firefox, and Secret mode in Samsung Internet.

M.      "Third-Party Browser" means any web browser that is not Google Chrome or another proprietary Google web browser and includes, by way of example, Apple Safari, Mozilla Firefox, and Samsung Internet.

N.      "Third-Party General Search Service" means a web search service that can respond to a broad range of search query categories and offers functionality that is substantially similar to Google Search, and is not owned by Google or its affiliates.

O.      "Third-Party Generative AI Assistive Service" means a stand-alone mobile software application that is a generative artificial intelligence chatbot that has among its principal functions answering information-seeking prompts across a wide variety of topics using a broad range of publicly available information, and that is not owned by Google or its affiliates.

## VII.    THIRD-PARTY RIGHTS

Nothing in this Final Judgment is intended to confer upon any other persons any rights or remedies of any nature.

## VIII.   RETENTION OF JURISDICTION

This Court retains jurisdiction for the purpose of enabling any of the parties to this Final Judgment to apply for such further orders or directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify or terminate any of its provisions, and to enforce compliance.

Dated: _____          _____
                                                    Amit P. Mehta
                                          United States District Court Judge